# United States Court of Appeals for the Federal Circuit

04-1029

KAW NATION,

Appellant,

v.

Gale A. Norton, SECRETARY OF THE INTERIOR,

Appellee,

and

KAW NATION OF OKLAHOMA, ex rel. GUY MUNROE,
WANDA STONE, GUYETTA MONROE-MARTIN,
and THE KAW NATION GENERAL COUNCIL,

Intervenors.

Michael Minnis, Doerner, Saunders, Daniel & Anderson, L.L.P., of Oklahoma City, Oklahoma, argued for appellant.

Kyle E. Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director.

Lindsay R. Naas, of Chandler, Arizona, argued for intervenors. Of counsel on the brief were Charles A. Hobbs, Jerry C. Straus, and Eric D. Lemont, Hobbs, Straus, Dean & Walker, LLP, of Washington, DC.

Appealed from: United States Department of Interior Board of Contract Appeals

# United States Court of Appeals for the Federal Circuit

04-1029

KAW NATION,

Appellant,

v.

Gale A. Norton, SECRETARY OF THE INTERIOR,

Appellee,

and

KAW NATION OF OKLAHOMA, ex rel. GUY MUNROE,
WANDA STONE, GUYETTA MONROE-MARTIN,
and THE KAW NATION GENERAL COUNCIL,

Intervenors.

_____

DECIDED:  May 2, 2005
_____

Before MICHEL, <u>Chief Judge</u>, SCHALL and DYK, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Appellant, styled Kaw Nation ("the EC4 Group"), claims to represent the federally-recognized Kaw Nation Indian tribe.  The EC4 Group appeals from a decision by the Department of the Interior Board of Contract Appeals ("IBCA" or "Board").  The Board held that the Department of Interior ("Interior") was not authorized to accept the retrocession of the tribal court program and required that the agency release withheld program funds to the tribe pursuant to the 2003 Annual Funding Agreement of the

Nation's self-governance compact. Kaw Nation ex rel. Guy Munroe, Executive Council Chairman; Wanda Stone and Guyetta Monroe-Martin, Executive Council Members; and the Kaw Nation Gen. Council, No. IBCA 4455A (July 31, 2003) ("IBCA Decision"). Appellee, Gale A. Norton, Secretary of Interior ("Interior") urges that the appeal should be dismissed as moot, in light of the fact that the government has now paid the disputed amounts and will not seek to recover them, and also urges us to vacate the Board's decision. Intervenors, styled Kaw Nation of Oklahoma, ex rel. Guy Munroe, Wanda Stone, Guyetta Monroe-Martin, and the Kaw Nation General Council ("the Munroe Group") were the prevailing parties before the IBCA, and also claim to represent the Kaw Nation. The Munroe Group agrees that the appeal should be dismissed as moot, but urges that we not vacate the judgment. We agree that the case is moot, but hold that exceptional circumstances warrant vacatur of the judgment.

BACKGROUND

The Kaw Nation is a federally-recognized Indian tribe, organized pursuant to the Oklahoma Indian Welfare Act of 1936, ch. 831, 49 Stat. 1967, codified in 25 U.S.C. § 501 et seq., and operating under a constitution adopted by the Nation and approved by Interior on August 4, 1990. The present controversy is basically an intratribal dispute between two factions of the Kaw Nation—the EC4 Group, and the opposing faction, the Munroe Group. The controversy has resulted in litigation before the Board (which is the subject of the present appeal); in the Kaw Nation tribal courts; the Oklahoma state

courts; the United States District Court for the Western District of Oklahoma; the Tenth Circuit; and before the Interior Board of Indian Appeals ("IBIA").[1]

Under its constitution, the Tribe has two legislative bodies: a seven-member Executive Council and a General Council composed of all adult tribal members. The Executive Council is empowered to act by majority vote. The constitution also provides for a judicial branch, composed of a Supreme Court consisting of three judges and such inferior courts as may be established by tribal law. The constitution provides that judges of the Kaw Supreme Court and judges of the inferior courts are selected by the Executive Council and confirmed by the General Council.

At the time the Tribe's constitution was approved, the Kaw Nation did not have an operating court system, and judicial power was then vested in the Interior Department, Bureau of Indian Affairs ("BIA") Court of Indian Offenses. The Kaw Nation's court system was established in 1991. Funding for the tribal courts has been provided by the Federal Government by agreement with the Tribe pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450-450n ("ISDA"). This agreement is enforceable against the government if the required payments are not made. See generally Cherokee Nation of Okla. v. Leavitt, 125 S. Ct. 1172 (2005). Among the monies to be paid to the tribe in 2003 under the agreement were funds in

---

[1] See, e.g., In re Removal of Clyde F. McCauley, No. CIV-02-12, (Kaw Tribal District Court, March 12, 2003); In re Removal of Clark Pepper, No. CIV-02-13, Kaw Tribal District Court, March 12, 2003; Michael Minnis & Assocs., P.C. v. Kaw Nation, 90 P.3d 1009 (Okla. Ct. App. 2003); Kaw Nation, ex rel. Clyde McCauley v. Lujan, 378 F.3d 1139 (10th Cir. 2004); Kaw Nation of Okla. v. Acting S. Plains Reg'l Dir., BIA, IBIA 03-94-A, IBIA 03-107-A, (IBIA June 18, 2003).

04-1029                                    3

the approximate amount of $7,617, which the tribe was to apply to the approximately $80,000 annual cost of operating the Kaw Nation Court system.

Under the pertinent regulations, a Tribe that receives funding under a self-governance compact for a program that would otherwise be administered by the BIA may voluntarily retrocede the program upon submission of a written notice to the Office of Self Governance ("OSG") that includes a "Tribal resolution or other official action of its governing body". 25 C.F.R. Ch. VI, Subpart N—Retrocession, § 1000.333 (2004). The regulations further provide that retrocession will become effective on a date mutually agreed upon by the Tribe and the BIA, or as provided in the compact. 25 C.F.R. § 1000.334.[2]

The present controversy arose when, in the middle of 2002, proceedings were pending in the Tribal Courts to remove appellants, the EC4 group, from their positions on the Executive Council based on allegations of self-dealing. The EC4 Group, in turn, alleged defects in the process by which the judges were appointed. Based on these alleged defects, the EC4 Group, acting as a majority of the Executive Council, sought to return control of the Kaw Nation courts to the BIA and to release the funds destined for the operation of the Tribal Courts under the Self-Governance Compact. The EC4 Group claimed this action was authorized by the Tribe's constitution and by the applicable federal regulations governing retrocession. At the November 16, 2002,

---

[2] The Kaw Nation Compact of Self-Governance provides that the effective date of retrocession "shall be forty-five calendar days from the date of request by the Nation, unless the United States and the Nation mutually agree to an effective date more or less than forty five calendar days from the date of the request by the Nation. Then the mutually agreed upon date shall be the effective date of such retrocession." (J.A. at 105.)

04-1029                                    4

meeting, the measure was approved by the EC4 Group, despite the objections of the remaining three members of the Executive Council, i.e., the Munroe Group. On December 12, 2002, the EC4 Group further formalized this action when, acting as a majority of the Executive Council, it passed a resolution to "explicitly turn[] the control of its courts back to the BIA and submit[] to the jurisdiction of the courts of the [BIA] and knowingly release[] the monies . . . under said compact." Kaw Nation Executive Council Resolution No. 96A. The controversy continued when, on February 9, 2003, the Kaw General Council purported to cure one of the alleged defects in the selection of judges by approving those appointments that were in question.

On February 28, 2003, based on the actions of the Executive Council, the OSG recognized the retrocession of the tribal court program, and informed the Executive Council that it was retaining a portion of the Kaw Nation's 2003 funding for tribal courts and would use the funds to defray the costs of operating a court system for the Tribe. The OSG informed the tribe that as of five days from the date of the letter (March 5, 2003), the Nation could not expend federal funds for its tribal courts, and that any funds expended for that purpose would be deemed disallowed costs subject to required repayment. The letter also stated that the decision could be appealed to the IBCA, consistent with 25 C.F.R. § 1000.428, which entitles Tribes to appeal post-award administrative decisions to the IBCA. Under 25 C.F.R. § 900.230, which is incorporated by reference into 25 C.F.R. § 1000.429, "Indian tribes and tribal organizations shall continue performance of a contract during the appeal of any claims."

Despite the February 2003 OSG decision, the removal actions against the EC4 members nonetheless proceeded in the tribal courts. On March 10, 2003, the Kaw

Nation district court issued separate decisions removing two of the four members of the EC4 Group from the Executive Council.[3] Then, on March 17, 2003, the BIA advised the Executive Council Chairman that it had "re-assumed" jurisdiction over civil and criminal matters for the Kaw Nation, and that it would no longer recognize orders and decisions issued by the Kaw Nation courts. (J.A. at 69.) On April 8, 2003, the BIA further notified the Executive Council that it would not recognize any actions taken by the tribal court after February 28, "the date the [OSG] accepted the retrocession of the Tribal Court under Kaw Executive Council Resolution No. 96A." (J.A. at 71.) On April 29, 2003, the BIA published a final Federal Register notice, 68 Fed. Reg. 22728 stating that "[t]he Kaw Nation's retrocession and closing of its tribal court creates a jurisdictional vacuum" and that the BIA "must immediately reassume juridical jurisdiction . . . until such time as the Nation reestablishes its court."[4]

The Munroe Group filed an appeal of the February 28, 2003, decision with the IBCA on March 26, 2003, alleging that the government, in accepting the retrocession of the tribal courts, had breached the self-determination agreement with the Tribe, and had improperly withheld approximately ten percent of the $80,000 annual cost of operating the Kaw Nation court system. On May 7, 2003, the Munroe Group petitioned the Board for a Stay of the Retrocession action. The Munroe Group claimed, inter alia, that the

---

[3] Removal actions were also proceeding against the other two members of the EC4 Group. They were removed by order of the tribal court in November of 2003.

[4] There was initially some confusion in the proceedings below as to whether the Tribe's action was a voluntary retrocession of a federally-funded program, governed under 25 C.F.R. Part 1000; or required emergency reassumption of judicial jurisdiction, governed under 25 C.F.R. § 11.100(c); or was subject to both regulatory regimes. The government later clarified in its filings before the IBCA that Interior's action involved a voluntary retrocession and not an emergency reassumption.

BIA violated various procedural regulations in making the retrocession effective and also violated the terms of the tribal constitution and of the funding agreement.

Before the IBCA, Interior moved to dismiss the appeal, arguing, inter alia, that the IBCA lacked jurisdiction to order a stay of a voluntary retrocession of a self-governance program by the tribal government; that the Munroe Group lacked standing to pursue the appeal; and that the IBCA lacked jurisdiction to review Interior's determination regarding the recognition of tribal officials. In June 2003, the Board nonetheless issued the requested stay which had the effect of requiring Interior to pay the withheld funds to the tribe. This payment was subsequently made.

The IBCA found that the Munroe Group had standing to maintain the appeal because Chairman Munroe "not only headed the Executive Council but . . . was the Chief Executive Officer of the Nation [and] was expressly authorized by the General Council to challenge the Department's action accepting the purported 'retrocession' . . . [and] was also sustained by the General Council when he sought the removal of two of the EC4 Group and then replaced them with new Executive Council members who agreed with him that the Nation's judicial functions should not be retroceded to BIA." IBCA Decision, slip op. at 15.

The EC4 Group participated in the IBCA proceeding through the filing of a Notice of Special Appearance to advise the Board that the Kaw Nation had not authorized the appeal and subsequently submitted briefs objecting to the Munroe Group's petition to stay the retrocession, and in support of the government's motion for reconsideration of the Board's order granting the stay. On July 30, 2003, the EC4 group filed a request with the IBCA, seeking to be recognized as a party to the action.

On July 31, 2003, the IBCA, exercising jurisdiction under the Contract Disputes Act, as made applicable to disputes arising under the ISDA pursuant to 25 U.S.C. § 450m-1(d), denied the EC4 Group's motion to be recognized as a party and granted the Munroe Group's motion for summary judgment "nullifying [Interior's] February 28, 2003, letter and its consequences," and holding that "[t]he Kaw Nation is entitled to retain its judicial functions." IBCA Decision, slip op. at 16. The grounds for the decision were three-fold.

First, the Board held that the OSG decision of February 28, 2003, "violate[d] the Compact provisions and the regulations at 25 CFR 1000.334 and 1000.336, [sic] requiring negotiation with the Chairman, as the designated official under the Compact, concerning the effective date of the retrocession and the amount of funds, if any, to be returned to the Government." Id. at 9.[5]   Second, the Board concluded that the "judiciary was not a 'program' [within the retrocession regulations] as such [but a] governmental function," which could not be retroceded. Id. at 13-14.  Third, the Board held that the OSG "violated principles of Federal Indian law under which an Indian tribe has the right to interpret its own governing documents in resolving internal disputes" and that the OSG knew the validity of the retrocession "was openly disputed and was the subject of ongoing proceedings within the Kaw Nation." Id. at 9.  The Kaw Nation General Council had "clearly expressed its disapproval of the attempts to retrocede the judicial branch . . . and the Kaw Nation courts were in the process of rendering a

---

[5]     Under the regulations governing retrocession, the effective date of the retrocession and the amount of funds, if any, to be returned to the government, required negotiation with the Tribe, 25 C.F.R. §§ 1000.334 and 1000.336.

decision." Id. at 10. However, the Board did not explain why its own exercise of jurisdiction did not raise similar problems concerning interference in intratribal disputes.

The EC4 Group filed an appeal of the IBCA decision with this court in October 2003, challenging, among other things, the Board's denial of its request to be recognized as a party. We granted the Munroe Group's motion for leave to intervene in November 2003. Interior initially filed a separate appeal of the IBCA decision, which was then consolidated with the EC4 Group appeal. However, on August 4, 2004, the Assistant Secretary for Indian Affairs formally rescinded the government's February 2003 acceptance of the retrocession of funding and stated that the government no longer wished to pursue its claim to the withheld funds. The letter also "rescinded" the letters stating the position that the actions undertaken by the Kaw nation courts were invalid; and acknowledged that the Kaw Nation possessed a functioning court system.[6]

The parties confirmed at oral argument that the funds which were the subject of the original dispute before the IBCA have been released and that Interior does not seek recovery of those funds.

## DISCUSSION

This court has jurisdiction to review decisions of the IBCA under 28 U.S.C. § 1295(a)(10). Thompson v. Cherokee Nation of Okla, 334 F.3d 1075, 1084 (Fed. Cir. 2003), aff'd sub nom Cherokee Nation of Okla v. Leavitt, 125 S. Ct. 1172 (2005). We review the IBCA's assertion of jurisdiction and grant of summary judgment without

---

[6] On February 15, 2005, the BIA rescinded the Federal Register notice of April 29, 2003 and confirmed the functioning of the Kaw Nation court system. 70 Fed. Reg. 7756 (Feb. 15, 2005).

deference.  Id.; see also Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't, 194 F.3d 1374, 1377 (Fed. Cir. 1999).

I

Interior and the Munroe Group urge that the case is moot because the government has abandoned its appeal, has paid the disputed amounts to the Kaw Nation, and has waived any right it might have to recover those payments.  We agree.  The Supreme Court's decision in U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership makes clear that a party's voluntary action can render moot a case or controversy.  513 U.S. 18, 20 (1994).  The controversy in Bancorp centered on the applicability of "the new value exception" to the absolute priority rule, and, in particular, whether or not that exception had survived the enactment of the Bankruptcy Code.  Id.  Subsequent to the Supreme Court's grant of certiorari, the parties stipulated to a consensual plan of reorganization, which received the approval of the Bankruptcy Court.  Id.  The Court held that confirmation of the plan mooted the controversy underlying the original dispute.  Id.  Similarly here, the release of the disputed funds and the waiver by Interior of any future right to secure their return has mooted the controversy that formed the basis for the original contract action before the IBCA.

II

Although the EC4 Group agrees that there is no longer a live controversy with respect to the underlying contract claim, it nonetheless urges that the appeal is not moot.  Specifically, it argues that we must decide whether the IBCA properly had jurisdiction over the dispute.  The EC4 Group asserts that the IBCA did not have jurisdiction because the matter was an internal tribal dispute and because the Munroe

Group lacked standing to bring the appeal. Appellants further contend that such jurisdictional challenges can never become moot. We disagree.

While the EC4 Group may be correct that we could decide these jurisdictional issues before reaching the question of mootness, there is no requirement that we do so. What the EC4 Group fails to comprehend is that, generally, we may address jurisdictional issues in any order. See Tenet v. Doe, 125 S. Ct. 1230, 1235 n.4 (2005) (finding judicial review barred and declining to reach issue of Tucker Act jurisdiction); Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999) (deciding personal rather than subject matter jurisdiction issue); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (holding that standing, like mootness, is a threshold jurisdictional issue, and deciding issue of standing without reaching mootness issue). Indeed, where, as here, the underlying controversy is clearly moot, the preferred course is to decide mootness, before reaching difficult questions more closely tied to the merits of the underlying controversy, such as subject matter jurisdiction. We therefore decline to reach the issue of the propriety of the IBCA's original exercise of jurisdiction in light of the undisputed fact that the underlying contract claim is now moot, and the case has "lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law." Princeton Univ. v. Schmid, 455 U.S. 100, 103, (1982) (quoting Hall v. Beals, 396 U.S. 45, 48 (1969)).[7]

---

[7] The EC4 Group also argues that the appeal is not moot because the Munroe Group has applied to the IBCA for attorney fees under the Equal Access to Justice Act. This argument is without merit. In Bancorp, for example, the Court recognized that the power of a court to award costs did not prevent the underlying controversy from being moot. 513 U.S. at 21.

III

The crux of this case is whether we should simply dismiss the appeal for mootness, or whether we should also vacate the decision of the Board. In addition to challenging the denial of its request to be recognized as a party, the EC4 Group urges that we vacate the decision. The government also urges vacatur. The Munroe Group, the prevailing party below, opposes. We conclude that the IBCA decision should be vacated.

Under the Supreme Court's decision in Bancorp, when a case becomes moot by voluntary action of the losing party, vacatur of the judgment on appeal is generally not appropriate.[8] 513 U.S. at 24-25. However, there is an exception for special circumstances:

> [M]ootness by reason of settlement does not justify vacatur of a judgment under review. This is not to say that vacatur can never be granted when mootness is produced in that fashion. As we have described, the determination is an equitable one, and exceptional circumstances may conceivably counsel in favor of such a course.

Id. at 29.

Thus, any appraisal of whether exceptional circumstances warrant vacatur requires a balancing of the equities, and, in particular, a weighing of the public interest in preserving "the orderly operation of the federal judicial system" versus the private interests of the parties seeking vacatur. Id. at 27.

---

[8] Although Interior contends that the BIA's rescission letter of August 2004 should not be considered voluntary action, but rather an independent agency action, that contention is without merit. See Karcher v. May, 484 U.S. 72, 83 (1987) (decision to decline to pursue an appeal constitutes voluntary action).

While we doubt that the judgment, if not vacated, could have any continuing res judicata or collateral estoppel effect on the EC4 Group,[9] the decision of the IBCA may have continuing effects as precedent. Under these circumstances, the equities favor vacating the judgment.

First, the judgment potentially affects parties who did not cause the controversy to become moot. If only the Secretary, the party that caused the case to become moot, were affected by the precedential effect of the decision, vacatur on appeal would not be appropriate. As the Court observed in Bancorp, where "the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal . . . [,] the judgment is not unreviewable, but simply unreviewed by his own choice." 518 U.S. at 25.

However, the EC4 group had nothing to do with the mootness, and, in fact, strenuously opposed the actions of the Secretary that caused the case to become moot. The primary effect of leaving the decision in place is to potentially adversely affect its interests.

The Munroe Group urges that exceptional circumstances are not present here, asserting that they are entitled to the benefit of the Board decision in their continuing dispute with the EC4 Group. They argue that the EC4 appeal should be "dismissed, with prejudice" (Br. of Intervenor at 15.) and that "[k]eeping the IBCA decision intact assures that no one can challenge the validity of the Kaw Nation tribal court system— especially during the period from February 28, 2003 through July 31, 2004." (Br. of

---

[9] See Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed. Cir. 2003) (holding that parties to be collaterally estopped must have had an opportunity to fully and fairly litigate the issue in question); Aqua Marine Supply v. Aim Machining, Inc., 247 F.3d 1216, 1221 (Fed. Cir. 2001) (recognizing the issue but declining to decide on the facts of that case).

Intervenor at 25.) Far from negating the existence of exceptional circumstances, we think that this desire to preserve any effects of the IBCA decision regarding the validity of the court system demonstrates the existence of the exceptional circumstances that Bancorp requires in order to justify vacatur. See Associated Gen. Contractors v. City of New Haven, 41 F.3d 62, 67 (2d Cir. 1994) (noting that the rationale of avoiding any adverse collateral effects of a judgment mooted during the pendency of the appeal was "especially compelling when the party that prevailed [below] seeks to moot the appeal"); see also Aqua Marine, 247 F.3d at 1220-21.

Courts have held that even "moral appraisals" and the potential practical effect on third parties may make vacatur appropriate. In Microsoft Corp. v. Bristol Technology, Inc., 250 F.3d 152 (2d Cir. 2001), the Second Circuit found that exceptional circumstances sufficient to vacate a judgment based on voluntary settlement included the fact "that individuals (some not named parties) are the subject of moral appraisals integral to the findings on punitive damages." Id. at 156; see also N. Cal. Power Agency v. Nuclear Regulatory Comm'n, 393 F.3d 223, 225 (D.C. Cir. 2004) (granting appellant's request to vacate an agency order when appellant was not a party to the settlement between the appellee and the intervenor that mooted the order).

Second, the decision of the Board in this case, invalidating a decision of the Secretary, at its heart involves an intratribal dispute and in this respect presents difficult and complex issues that may be beyond the Board's jurisdiction. Typically, the courts are reluctant to resolve such intratribal disputes at all because their resolution is viewed as an intrusion into tribal sovereignty. The Supreme Court, on various occasions, has reaffirmed the principle that "Indian tribes occupy a unique status under our law" and

that they "retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America." Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 851 (1985) (citations omitted). In Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59-60 (1978), the Court recognized a need to respect tribal sovereignty by avoiding the resolution of intratribal disputes in the federal courts, and noted, in particular, that "resolution in a foreign forum of intratribal disputes of a more 'public' character, . . . cannot help but unsettle a tribal government's ability to maintain authority."

The same concern exists with respect to the authority of the IBCA to resolve tribal disputes. The IBCA has exclusive jurisdiction to hear claims regarding self-determination contracts that are brought pursuant to the Contract Disputes Act. However, it is by no means apparent that the Contract Disputes Act confers jurisdiction to resolve intratribal disputes. Arguably, if the federal government is to play any role in deciding such disputes, the appropriate agency is the BIA. The BIA has "both the authority and responsibility to interpret tribal law when necessary to carry out the government-to-government relationship with the tribe." Ransom v. Babbitt, 69 F. Supp. 2d 141, 150 (D.D.C. 1999) (quoting United Keetowah Band of Cherokee Indians in Okla. v. Muskogee Area Dir., 22 IBIA 75, 80 (June 4, 1992)) (emphasis omitted). Such BIA decisions concerning matters of tribal governance are generally appealable to the Board of Indian Appeals,[10] and not to the Board of Contract Appeals.[11] See 43 C.F.R. §

---

[10] Decisions of the BIA made at the level of Assistant Secretary or above, are apparently reviewable in district court. Shawnee Tribe v. Assistant Sec'y Indian Affairs, 39 IBIA 4 (2003).

4.1(b)(2)(i) (2004) (BIA administrative actions issued under 25 C.F.R. Chapter I (which includes Tribal Government matters) are appealable to the IBIA).  On the other hand, it may be argued that the Board, in the exercise of its undisputed jurisdiction over the contracts dispute, inevitably was required to resolve the intratribal dispute.

As noted earlier, we decline to decide this difficult issue of the Board's authority. It is sufficient that other cases have recognized the appropriateness of vacating a judgment on appeal when there are questions as to the authority of the tribunal under review.  In Microsoft, the Second Circuit determined that exceptional circumstances warranted vacatur of a district court order that awarded $1 million in punitive damages and granted injunctive relief, subsequent to the parties' voluntary settlement of a federal and state antitrust dispute, in part because it was "unclear whether the district court had the power to reach the issue of punitive damages."  250 F.3d at 155.  Similarly, in Wal-Mart Stores, Inc. v. Rodriguez, 322 F.3d 747, 750 (1st Cir. 2003), the First Circuit found that, after the parties had voluntarily settled the underlying dispute, federalism concerns nonetheless provided exceptional circumstances sufficient to support vacatur of an "unusual" federal district court injunction that restrained local law enforcement from bringing a Puerto Rican antitrust action.   So here, tribal sovereignty concerns and the questions as to the IBCA's jurisdiction to resolve intratribal disputes support a finding of exceptional circumstances that warrants vacatur.

---

[11]      In this case, the Munroe Group sought review before the IBIA of the OSG decisions of March 17, 2003 (advising that the BIA had reassumed jurisdiction over civil and criminal matters) and April 8, 2003 (advising that the BIA would not recognize the removal of two EC4 Group members that occurred after the February 28, 2003 decision).   The IBIA declined to exercise jurisdiction at that time because the same issues were under review in a matter pending before the district court.   (J.A. at 152-53.)

CONCLUSION

For the foregoing reasons, we vacate the decision below and remand to the

IBCA to dismiss the case as moot.

<u>VACATED AND REMANDED</u>

COSTS

No costs.