CHEROKEE NATION OF OKLAHOMA ET AL. *v.*
LEAVITT, SECRETARY OF HEALTH AND
HUMAN SERVICES, ET AL.

No. 02–1472.   Argued November 9, 2004—Decided March 1, 2005*

---

*Together with No. 03–853, *Leavitt, Secretary of Health and Human Services* v. *Cherokee Nation of Oklahoma,* on certiorari to the United States Court of Appeals for the Federal Circuit.

632

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in part, *post*, p. 647. REHNQUIST, C. J., took no part in the decision of the cases.

*Lloyd B. Miller* argued the cause for petitioners in No. 02–1472 and respondent in No. 03–853. With him on the briefs were *Arthur Lazarus, Jr., Harry R. Sachse, William R. Perry, Carter G. Phillips,* and *Stephen B. Kinnaird.*

*Sri Srinivasan* argued the cause for the federal parties in both cases. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Keisler, Deputy Solicitor General Kneedler, Barbara C. Biddle, Jeffrica Jenkins Lee,* and *Alex M. Azar II.*†

JUSTICE BREYER delivered the opinion of the Court.

The United States and two Indian Tribes have entered into agreements in which the Government promises to pay certain "contract support costs" that the Tribes incurred during fiscal years (FYs) 1994 through 1997. The question before us is whether the Government's promises are legally binding. We conclude that they are.

I

The Indian Self-Determination and Education Assistance Act (Act), 88 Stat. 2203, as amended, 25 U. S. C. § 450 *et seq.* (2000 ed. and Supp. II), authorizes the Government and Indian tribes to enter into contracts in which the tribes promise to supply federally funded services, for example tribal health services, that a Government agency would otherwise provide. See § 450f(a); see also § 450a(b). The Act specifies that the Government must pay a tribe's costs, including administrative expenses. See §§ 450j–1(a)(1) and (2). Administrative expenses include (1) the amount that the agency would have spent "for the operation of the progra[m]" had the agency itself managed the program, § 450j–1(a)(1),

---

†Briefs of *amici curiae* urging reversal in No. 02–1472 and affirmance in No. 03–853 were filed for the National Congress of American Indians by *Edward C. DuMont;* and for the Tunica-Biloxi Tribe of Louisiana by *Michael P. Gross* and *C. Bryant Rogers. Ian Heath Gershengorn, Donald B. Verrilli, Jr., Herbert L. Fenster,* and *Robin S. Conrad* filed a brief for the Chamber of Commerce of the United States of America et al. as *amici curiae* urging affirmance in No. 03–853.

*Geoffrey D. Strommer, Joseph H. Webster,* and *Charles A. Hobbs* filed a brief for the Seldovia Village Tribe as *amicus curiae.*

and (2) "contract support costs," the costs at issue here. § 450j–1(a)(2).

The Act defines "contract support costs" as other "reasonable costs" that a federal agency would not have incurred, but which nonetheless "a tribal organization" acting "as a contractor" would incur "to ensure compliance with the terms of the contract and prudent management." *Ibid.* "[C]ontract support costs" can include indirect administrative costs, such as special auditing or other financial management costs, § 450j–1(a)(3)(A)(ii); they can include direct costs, such as workers' compensation insurance, § 450j–1(a)(3)(A)(i); and they can include certain startup costs, § 450j–1(a)(5). Most contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe." Brief for Federal Parties 7; see 25 U. S. C. §§ 450b(f)–(g).

The first case before us concerns Shoshone-Paiute contracts for FYs 1996 and 1997 and a Cherokee Nation contract for 1997. The second case concerns Cherokee Nation contracts for FYs 1994, 1995, and 1996. In each contract, the Tribe agreed to supply health services that a Government agency, the Indian Health Service, would otherwise have provided. See, *e. g.*, App. 88–92 (Shoshone-Paiute Tribal Health Compact), 173–175 (Compact between the United States and the Cherokee Nation). Each contract included an "Annual Funding Agreement" with a Government promise to pay contract support costs. See, *e. g.*, *id.*, at 104–128, 253–264. In each instance, the Government refused to pay the full amount promised because, the Government says, Congress did not appropriate sufficient funds.

Both cases began as administrative proceedings. In the first case, the Tribes submitted claims seeking payment under the Contract Disputes Act of 1978, 92 Stat. 2383, 41 U. S. C. § 601 *et seq.*, and the Act, 25 U. S. C. §§ 450m–1(a), (d), 458cc(h), from the Department of the Interior (which manages the relevant appropriations). See, *e. g.*, App. 150–

151, 201–203. The Department denied their claim; they then brought a breach-of-contract action in the Federal District Court for the Eastern District of Oklahoma seeking $3.5 million (Shoshone-Paiute) and $3.4 million (Cherokee Nation). See *Cherokee Nation of Okla.* v. *Thompson,* 311 F. 3d 1054, 1059 (CA10 2002). The District Court found against the Tribes. *Cherokee Nation of Okla.* v. *United States,* 190 F. Supp. 2d 1248 (ED Okla. 2001). And the Court of Appeals for the Tenth Circuit affirmed. 311 F. 3d 1054 (2002).

In the second case, the Cherokee Nation submitted claims to the Department of the Interior. See App. 229–230. A contracting officer denied the claims; the Board of Contract Appeals reversed this ruling, ordering the Government to pay $8.5 million in damages. *Cherokee Nation of Okla.,* 1999–2 BCA ¶ 30,462, p. 150488; App. to Pet. for Cert. in No. 03–853, pp. 38a–40a. The Government sought judicial review in the Court of Appeals for the Federal Circuit. The Federal Circuit affirmed the Board's determination for the Tribe. *Thompson* v. *Cherokee Nation of Okla.,* 334 F. 3d 1075 (2003).

In light of the identical nature of the claims in the two cases and the opposite results that the two Courts of Appeals have reached, we granted certiorari. We now affirm the Federal Circuit's judgment in favor of the Cherokee Nation, and we reverse the Tenth Circuit's judgment in favor of the Government.

## II

The Government does not deny that it promised to pay the relevant contract support costs. Nor does it deny that it failed to pay. Its sole defense consists of the argument that it is legally bound by its promises if, and only if, Congress appropriated sufficient funds, and that, in this instance, Congress failed to do so.

The Government in effect concedes yet more. It does not deny that, *were these contracts ordinary procurement contracts,* its promises to pay would be legally binding. The

Tribes point out that each year Congress appropriated far more than the amounts here at issue (between \$1.277 billion and \$1.419 billion) for the Indian Health Service "to carry out," *inter alia,* "the Indian Self-Determination Act." See 107 Stat. 1408 (1993); 108 Stat. 2527–2528 (1994); 110 Stat. 1321–189 (1996); *id.,* at 3009–212 to 3009–213. These appropriations Acts contained no relevant statutory restriction.

The Tribes (and their *amici*) add, first, that this Court has said that

> "a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency." *Lincoln* v. *Vigil,* 508 U. S. 182, 192 (1993) (internal quotation marks omitted).

See also *International Union, United Auto., Aerospace & Agricultural Implement Workers of America* v. *Donovan,* 746 F. 2d 855, 860–861 (CADC 1984) (Scalia, J.); *Blackhawk Heating & Plumbing Co.* v. *United States,* 224 Ct. Cl. 111, 135, and n. 9, 622 F. 2d 539, 552, and n. 9 (1980).

The Tribes and their *amici* add, second, that as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of "insufficient appropriations," even if the contract uses language such as "subject to the availability of appropriations," and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made. See *Ferris* v. *United States,* 27 Ct. Cl. 542, 546 (1892) ("A contractor who is one of several persons to be paid out

of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects"); see also *Blackhawk, supra,* at 135, and n. 9, 622 F. 2d, at 552, and n. 9.

As we have said, the Government denies none of this. Thus, if it is nonetheless to demonstrate that its promises were not legally binding, it must show something special about the promises here at issue. That is precisely what the Government here tries, but fails, to do.

### A

The Government initially argues that the Act creates a special kind of "self-determination contrac[t]" with a "unique, government-to-government nature" that differentiates it from "standard government procurement contracts." Brief for Federal Parties 4. Because a tribe does not bargain with the Government at arm's length, *id.,* at 24, the law should charge it with knowledge that the Government has entered into other, similar contracts with other tribes; the tribe should bear the risk that a total lump-sum appropriation (though sufficient to cover its own contracts) will not prove sufficient to pay *all* similar contracts, *id.,* at 23–25. Because such a tribe has elected to "ste[p] into the shoes of a federal agency," *id.,* at 25, the law should treat it like an agency; and an agency enjoys no legal entitlement to receive promised amounts from Congress, *id.,* at 24–25. Rather, a tribe should receive only the portion of the total lump-sum appropriation allocated to it, not the entire sum to which a private contractor might well be entitled. *Id.,* at 24.

The Government finds support for this special treatment of its promises made pursuant to the Act by pointing to a statutory provision stating that "'no [self-determination] contract . . . shall be construed to be a procurement contract,'" *id.,* at 23 (quoting 25 U. S. C. § 450b(j); alterations in original). It finds supplementary support in another provi-

sion that says that a tribe need not deliver services "'in excess of the amount of funds awarded,'" Brief for Federal Parties 24 (quoting 25 U. S. C. § 450*l*(c); citing § 458aaa–7(k)).

These statutory provisions, in our view, fall well short of providing the support the Government needs. In general, the Act's language runs counter to the Government's view. That language strongly suggests that Congress, *in respect to the binding nature of a promise,* meant to treat alike promises made under the Act and ordinary contractual promises (say, those made in procurement contracts). The Act, for example, uses the word "contract" 426 times to describe the nature of the Government's promise; and the word "contract" normally refers to "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty," Restatement (Second) of Contracts § 1 (1979). The Act also describes payment of contract support costs in a provision setting forth a sample "Contract." 25 U. S. C. § 450*l*(c) (Model Agreement §§ 1(a)(1), (b)(4)). Further, the Act says that if the Government refuses to pay, then contractors are entitled to "money damages" in accordance with the Contract Disputes Act. 25 U. S. C. § 450m–1(a); see also §§ 450m–1(d), 458cc(h).

Neither do the Act's general purposes support any special treatment. The Act seeks greater tribal self-reliance brought about through more "effective and meaningful participation by the Indian people" in, and less "Federal domination" of, "programs for, and services to, Indians." § 450a(b). The Act also reflects a congressional concern with Government's past failure adequately to reimburse tribes' indirect administrative costs and a congressional decision to require payment of those costs in the future. See, *e. g.,* § 450j–1(g); see also §§ 450j–1(a), (d)(2).

The specific statutory language to which the Government points—stating that tribes need not spend funds "in excess of the amount of funds awarded," § 450*l*(c) (Model Agreement

§ 1(b)(5))—does not help the Government. Cf. Brief for Federal Parties 18. This kind of statement often appears in ordinary procurement contracts. See, e. g., 48 CFR § 52.232–20(d)(2) (2004) (sample "Limitation of Cost" clause); see generally W. Keyes, Government Contracts Under the Federal Acquisition Regulation § 32.38, p. 724 (3d ed. 2003). Nor can the Government find adequate support in the statute's statement that "no [self-determination] contract . . . shall be construed to be a procurement contract." 25 U. S. C. § 450b(j). In context, that statement seems designed to relieve tribes and the Government of the technical burdens that often accompany procurement, not to weaken a contract's binding nature. Cf. 41 CFR § 3–4.6001 (1976) (applying procurement rules to tribal contracts); S. Rep. No. 100–274, p. 7 (1987) (noting that application of procurement rules to contracts with tribes "resulted in excessive paperwork and unduly burdensome reporting requirements"); id., at 18–19 (describing decision not to apply procurement rules to tribal contracts as intended to "greatly reduc[e]" the federal bureaucracy associated with them). Finally, we have found no indication that Congress believed or accepted the Government's current claim that, because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an unrestricted lump-sum appropriation would prove insufficient to pay *all* contractors. Compare Brief for Federal Parties 23–24 with *Ferris*, 27 Ct. Cl., at 546.

B

The Government next points to an Act proviso, which states:

"Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is [1] *subject to the availability of appropriations* and the Secretary [2] is *not required to reduce funding for programs, projects, or activities serving a tribe to make*

*funds available to another tribe* or tribal organization under this subchapter." 25 U. S. C. §450j–1(b) (emphasis and bracketed numbers added).

The Government believes that the two italicized phrases, taken separately or together, render its promises nonbinding.

1

We begin with phrase [2]. This phrase, says the Government, makes nonbinding a promise to pay one tribe's costs where doing so would require funds that the Government would otherwise devote to "programs, projects, or activities serving . . . another tribe," *ibid.* See Brief for Federal Parties 27–36. This argument is inadequate, however, for at the least it runs up against the fact—found by the Federal Circuit, see 334 F. 3d, at 1093–1094, and nowhere here denied— that the relevant congressional appropriations contained *other* unrestricted funds, small in amount but sufficient to pay the claims at issue. And as we have said, *supra*, at 636–638, the Government itself tells us that, in the case of ordinary contracts, say, procurement contracts,

> "if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment *even if the agency has allocated the funds to another purpose* or assumes other obligations that exhaust the funds." Brief for Federal Parties 23 (emphasis added).

See, *e. g., Lincoln,* 508 U. S., at 192; *Blackhawk,* 224 Ct. Cl., at 135, and n. 9, 622 F. 2d, at 552, and n. 9; *Ferris, supra,* at 546.

The Government argues that these other funds, though legally unrestricted (as far as the appropriations statutes' language is concerned), were nonetheless unavailable to pay "contract support costs" because the Government had to use those funds to satisfy a critically important need, namely, to pay the costs of "inherent federal functions," such as the cost

of running the Indian Health Service's central Washington office. Brief for Federal Parties 9–10, 27–34. This argument cannot help the Government, however, for it amounts to no more than a claim that the agency has allocated the funds to another purpose, albeit potentially a very important purpose. If an important alternative need for funds cannot rescue the Government from the binding effect of its promises where ordinary procurement contracts are at issue, it cannot rescue the Government here, for we can find nothing special in the statute's language or in the contracts.

The Government's best effort to find something special in the statutory language is unpersuasive. The Government points to language that forbids the Government to enter into a contract with a tribe in which it promises to pay the tribe for performing federal functions. See 25 U. S. C. § 458aaa–6(c)(1)(A)(ii); see also §§ 450f(a)(2)(E), 450j–1(a)(1), 450*l*(c) (Model Agreement § 1(a)(2)). Language of this kind, however, which forbids the Government to contract for certain kinds of services, says nothing about the *source* of funds used to pay for the supply of contractually legitimate activities (and that is what is at issue here).

We recognize that agencies may sometimes find that they must spend unrestricted appropriated funds to satisfy needs they believe more important than fulfilling a contractual obligation. But the law normally expects the Government to avoid such situations, for example, by refraining from making less essential contractual commitments; or by asking Congress in advance to protect funds needed for more essential purposes with *statutory* earmarks; or by seeking added funding from Congress; or, if necessary, by using unrestricted funds for the more essential purpose while leaving the contractor free to pursue appropriate legal remedies arising because the Government broke its contractual promise. See *New York Airways, Inc.* v. *United States*, 177 Ct. Cl. 800, 808–811, 369 F. 2d 743, 747–748 (1966) *(per curiam);* 31 U. S. C. §§ 1341(a)(1)(A) and (B) (Anti-Deficiency Act); 41

U. S. C. §601 *et seq.* (Contract Disputes Act); 31 U. S. C. §1304 (Judgment Fund); see generally 2 General Accounting Office, Principles of Federal Appropriations Law 6–17 to 6–19 (2d ed. 1992) (hereinafter GAO Redbook). The Government, without denying that this is so as a general matter of procurement law, says nothing to convince us that a different legal rule should apply here.

### 2

Phrase [1] of the proviso says that the Government's provision of funds under the Act is "subject to the availability of appropriations." 25 U. S. C. §450j–1(b). This language does not help the Government either. Language of this kind is often used with respect to Government contracts. See, *e. g.*, 22 U. S. C. §2716(a)(1); 42 U. S. C. §§6249(b)(4), 12206(d)(1). This kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become binding unless and until Congress appropriates funds for that year. See, *e. g.*, *Blackhawk,* *supra*, at 133–138, 622 F. 2d, at 551–553; see generally 1 GAO Redbook 4–6 (3d ed. 2004); 2 *id.*, at 6–6 to 6–8, 6–17 to 6–19 (2d ed. 1992). It also makes clear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations. See *Ferris*, 27 Ct. Cl., at 546; *New York Airways, supra*, at 809–813, 369 F. 2d, at 748–749; *Dougherty* v. *United States*, 18 Ct. Cl. 496, 503 (1883); 31 U. S. C. §§1341(a)(1)(A) and (B) (providing that without some such special authority, a contracting officer cannot bind the Government in the absence of an appropriation). Since Congress appropriated adequate unrestricted funds here, phrase [1], if interpreted as ordinarily understood, would not help the Government.

The Government again argues for a special interpretation. It says the language amounts to "an affirmative *grant* of au-

thority to the Secretary to adjust funding levels based on appropriations." Brief for Federal Parties 41 (emphasis in original). In so arguing, the Government in effect claims (on the basis of this language) to have the legal right to disregard its contractual promises if, for example, it reasonably finds other, more important uses for an otherwise adequate lump-sum appropriation.

In our view, however, the Government must again shoulder the burden of explaining why, in the context of Government contracts, we should not give this kind of statutory language its ordinary contract-related interpretation, at least in the absence of a showing that Congress meant the contrary. We believe it important to provide a uniform interpretation of similar language used in comparable statutes, lest legal uncertainty undermine contractors' confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services. See, e. g., Franconia Associates v. United States, 536 U. S. 129, 142 (2002); United States v. Winstar Corp., 518 U. S. 839, 884–885, and n. 29 (1996) (plurality opinion); id., at 913 (BREYER, J., concurring); Lynch v. United States, 292 U. S. 571, 580 (1934). The Government, in our view, has provided no convincing argument for a special, rather than ordinary, interpretation here.

The Government refers to legislative history, see Brief for Federal Parties 41–42 (citing, e. g., S. Rep. No. 100–274, at 48, 57), but that history shows only that Executive Branch officials would have liked to exercise discretionary authority to allocate a lump-sum appropriation too small to pay for all the contracts that the Government had entered into; the history does not show that Congress granted such authority. Nor can we find sufficient support in the other statutory provisions to which the Government points. See 25 U. S. C. § 450j–1(c)(2) (requiring the Government to report underpayments of promised contract support costs); 107 Stat. 1408 (Appropriations Act for FY 1994) (providing that $7.5 million

for contract support costs in "initial or expanded" contracts "shall remain available" until expended); 108 Stat. 2528 (same for FY 1995); 110 Stat. 1321–189 (same for FY 1996); *id.*, at 3009–213 (same for FY 1997). We cannot adopt the Government's special interpretation of phrase [1] of the proviso.

## C

Finally, the Government points to a later enacted statute, § 314 of the Department of the Interior and Related Agencies Appropriations Act, 1999, which says:

> "Notwithstanding any other provision of law [the] amounts appropriated to or *earmarked in committee reports* for the . . . Indian Health Service . . . for payments to tribes . . . for contract support costs . . . are the total amounts available for fiscal years 1994 through 1998 for such purposes." 112 Stat. 2681–288 (emphasis added).

See Brief for Federal Parties 45–50. The Government adds that congressional Committee Reports "earmarked," *i. e.*, restricted, appropriations available to pay "contract support costs" in each of FYs 1994 through 1997. *Id.*, at 48. And those amounts have long since been spent. See *id.*, at 12. Since those amounts "are the total amounts available for" payment of "contract support costs," the Government says, it is unlawful to pay the Tribes' claims. *Id.*, at 45–48.

The language in question is open to the interpretation that it retroactively bars payment of claims arising under 1994 through 1997 contracts. It is also open to another interpretation. Just prior to Congress' enactment of § 314, the Interior Department's Board of Contract Appeals considered a case similar to the present ones and held that the Government was legally bound to pay amounts it had promised in similar contracts. *Alamo Navajo School Bd., Inc. and Miccosukee Corp.*, 1998–2 BCA ¶ 29,831, p. 147681 (1997), and ¶ 29,832, p. 147699 (1998). The Indian Health Service contemporaneously issued a draft document that suggested the

use of unspent funds appropriated in prior years to pay unpaid "contract support costs." App. 206–209. Indeed, the document referred to use of unobligated funds from years including 1994 through 1997 to pay "contract support cost" debts. *Id.*, at 206–207. Section 314's language may be read as simply forbidding the Service to use those leftover funds for that purpose.

On the basis of language alone we would find either interpretation reasonable. But there are other considerations. The first interpretation would undo a binding governmental contractual promise. A statute that retroactively repudiates the Government's contractual obligation may violate the Constitution. See, *e. g., Winstar, supra,* at 875–876 (plurality opinion); *Perry* v. *United States,* 294 U. S. 330, 350–351 (1935); *Lynch, supra,* at 579–580; *United States* v. *Klein,* 13 Wall. 128, 144–147 (1872); see also, *e. g., Winstar, supra,* at 884–885, and n. 29 (plurality opinion) (describing practical disadvantages flowing from governmental repudiation); *Lynch, supra,* at 580 (same). And such an interpretation is disfavored. See *Clark* v. *Martinez, ante,* at 380–382; *Zadvydas* v. *Davis,* 533 U. S. 678, 689 (2001); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988). This consideration tips the balance against the retroactive interpretation.

The Government, itself not relying on either interpretation, offers us a third. It says that the statute simply clarifies earlier ambiguous appropriations language that was wrongly read as unrestricted. Brief for Federal Parties 48 (citing *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 380–381 (1969)). The earlier appropriations statutes, however, were not ambiguous. The relevant case law makes clear that restrictive language contained in Committee Reports is not legally binding. See, *e. g., Lincoln,* 508 U. S., at 192; *International Union,* 746 F. 2d, at 860–861; *Blackhawk,* 224 Ct. Cl., at 135, and n. 9, 622 F. 2d, at 552, and n. 9. No other restrictive language exists. The earlier appropriations stat-

utes unambiguously provided unrestricted lump-sum appropriations.   We therefore cannot accept the Government's interpretation of § 314.

Hence we, like the Federal Circuit, are left with the second interpretation, which we adopt, concluding that Congress intended it in the circumstances.   See *Zadvydas, supra,* at 689; cf. 334 F. 3d, at 1092.   So interpreted, the provision does not bar recovery here.

For these reasons, we affirm the judgment of the Federal Circuit; we reverse the judgment of the Tenth Circuit; and we remand the cases for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of these cases.

JUSTICE SCALIA, concurring in part.

I join the Court's opinion except its reliance, *ante,* at 640, on a Senate Committee Report to establish the meaning of the statute at issue here.   That source at most indicates the intent of one Committee of one Chamber of Congress—and realistically, probably not even that, since there is no requirement that Committee members vote on, and small probability that they even read, the entire text of a staff-generated report.   It is a legal fiction to say that this expresses the intent of the United States Congress.   And it is in any event not the inadequately expressed intent of the Congress, but the meaning of what it enacted, that we should be looking for.   The only virtue of this cited source (and its entire allure) is that it says precisely what the Court wants.