**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**May 4, 2009**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

SOUTHERN UTE INDIAN TRIBE,

     Plaintiff - Appellant,

v.

MICHAEL O. LEAVITT, Secretary of
the United States Department of
Health and Human Services;
RICHARD H. CARMONA, Surgeon
General of the United States;
CHARLES W. GRIM, Assistant
Surgeon General and Director of the
Indian Health Service; JAMES L.
TOYA, Director, Albuquerque Area
Office of the Indian Health Service;
UNITED STATES INDIAN HEALTH
SERVICE; UNITED STATES
PUBLIC HEALTH SERVICE;
UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

     Defendants - Appellees.


NATIONAL CONGRESS OF
AMERICAN INDIANS,

     Amicus Curiae.

No. 07-2274

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

Steven Boos, Maynes, Bradford Shipps & Sheftel, Durango, Colorado (with Monte Tyler Mills, Southern Ute Indian Tribe Legal Department, on the briefs) for Plaintiff-Appellant.

John S. Koppel (Gregory G. Katsas, Acting Assistant Attorney General, Gregory J. Fouratt, United States Attorney, and Barbara C. Biddle and Jeffrica Jenkins Lee, Attorneys, Appellate Staff, on the brief) Department of Justice, Washington, D.C., for Defendants-Appellees.

Lloyd B. Miller and Hilary V. Martin, Sonosky, Chambers, Sachse, Miller & Munson, LLP, Anchorage, Alaska, filed an amicus curiae brief for the National Congress of American Indians is support of Plaintiff-Appellant.

Before **HENRY**, Chief Judge, **TACHA** and **MURPHY**, Circuit Judges.

**HENRY**, Chief Judge.

In litigation arising from the Secretary of Health and Human Services's ("HHS") decision not to enter into a self-determination contract with the Southern Ute Indian Tribe, the district court issued two operative orders: the first order determined that the HHS decision was unlawful, granted summary judgment to the Tribe, and ordered the Tribe to prepare a form of an order for injunctive relief for HHS approval. The parties could not reach an agreement, which resulted in continued litigation and culminated in the district court's second order, which found in favor of the HHS approach as to the start date of the contract and to specifics regarding funding of the self-determination contract's ancillary costs.

The Tribe appeals from this second order. HHS argues that the second order is not a final judgment on the merits, depriving this court of jurisdiction, and we agree.

## I. Background

A.  The Indian Self-Determination and Education Assistance Act Reflects Congress's Commitment to Tribal Self-Determination.

In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDA"), in large part to strengthen "collaborative relationships" with Native American tribes. The ISDA, as amended, allows Native American tribes to enter into contracts with the Secretary of HHS, and under these contracts, the tribes themselves, rather than HHS, provide health service programs to their members. Should a tribe wish to control its programs, the ISDA essentially directs the Secretary of the Interior and the Secretary of HHS, upon the request of an Indian tribe, to turn over the direct operation of its federal Indian programs to that tribe. Once a tribe requests control of its programs, HHS and the tribe enter into a "self-determination contract," which the statute specifies must incorporate the provisions of a mandatory model contract included in the text of the ISDA. In return, HHS agrees to reimburse the tribes for administrative expenses and overhead costs called "contract support costs" incurred in the provision of these services. *See also* 25 U.S.C. § 450j-1(a)(2)-(3).

Under Title I of the ISDA, tribes are entitled to enter into these contracts, defined as contracts "for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j). The government must enter into self-determination contracts allowing tribal organizations to plan, conduct, and administer certain federal programs, including programs "for the benefit of Indians because of their status as Indians." *Id.* § 450f(a)(1)(E).

HHS acted upon Congress's express wish to transfer responsibility for the administration and management of these programs and services to the tribe:

> The Congress declares its commitment to the maintenance of the federal secretary's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

Pub. L. No. 93-638, § 3(b), 88 Stat. 2203.

The Indian Health Service ("IHS") is the primary federal health care provider for tribes and is the major source of tribal self-determination contracts, the type at issue here.[1]

---

[1] According to IHS's Year 2008 Profile,

> IHS services are administered through a system of 12 Area offices and 163 IHS and tribally managed service units. . . . There are 73 . . . compacts, funded through 94 Funding Agreements, totaling over $1 billion. These compacts represent 323 Tribes, more than half of all the

(continued...)

B.  Contract Support Costs Include a Variety of Indirect Administrative Costs.

Contract support costs generally encompass indirect administrative costs, such as special auditing or other financial management costs, 25 U.S.C. § 450j-1(a)(3)(A)(ii); direct costs, such as Workers' Compensation Insurance, § 450j-1(a)(3)(A)(i); and certain startup costs, § 450j-1(a)(5).  *Pueblo of Zuni v. United States*, 243 F.R.D. 436, 440 (D.N.M. 2007).  Most contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the tribe."  *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 635 (2005).  "Funding of indirect contract support costs is based on a variety of factors, including specific terms of each negotiated ISDA contract, each tribe's annual indirect cost rate, the amount of funding made available by Congress in the annual IHS appropriation and IHS policies and

_____

[1](...continued)
federally recognized Tribes.  There are also approximately 238 Tribes and tribal organizations that contract under Title I, with a total funding amount of $545 million.  Overall, approximately half of the IHS budget authority appropriation is administered by Tribes, primarily through Self-Determination contracts or Self-Governance compacts.

There are 34 urban programs, ranging from community health to comprehensive primary health care services. There are 15 tribal hospitals, 254 tribal health centers, 166 tribal Alaska village clinics, 112 health stations, and 18 tribal school health centers.

http://info.ihs.gov/Profile08.asp.

procedures for the calculation and distribution of indirect contract support costs."
*Pueblo of Zuni*, 243 F.R.D. at 440.

C.      The HHS Procedure upon Receipt of a Contract Proposal

Upon receipt of a contract proposal, HHS must review and approve or decline the proposal within ninety-days; failure to act within the ninety-day period results in the award of a contract by operation of law.  25 U.S.C. § 450j-1(a)(2).  HHS may decline a proposal for one of five specific reasons listed in 25 U.S.C. § 450f(a)(2):  HHS may (1) consider the program's service to be unsatisfactory; (2) determine that the proposal does not assure adequate protection of trust resources; (3) conclude that the proposed contract cannot properly complete or maintain the proposed project; (4) calculate that the contract's proposed funding level exceeds the total amount of funds to be paid under the contract under 25 U.S.C. §450j-1(a); or (5) conclude that the proposal's services or functions are beyond the scope of programs that the contractor may lawfully engage in.  If the HHS declines a proposal, a tribe may file an appeal through the administrative process or initiate an action in federal court.  25 U.S.C. § 450f(b).

The leading Supreme Court case involving the ISDA is *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005), which provides much of the backdrop for the current litigation.  In *Cherokee Nation*, the government entered into ISDA contracts with the Cherokee Nation and the Shoshone-Paiute Tribes of the Duck Valley Reservation (collectively, "the Tribes").  In two separate actions, the

Tribes submitted claims for fiscal years 1994 through 1997. After HHS refused to pay, the Tribes sued for breach of contract. In one case, this court upheld the HHS decision, and in the second action, the Court of Appeals for the Federal Circuit upheld a Board of Contract Claims decision favoring the Cherokee Nation Tribe. 543 U.S. at 636-37. The Supreme Court consolidated the appeals.

In *Cherokee Nation,* the government promised to pay, and, citing a lack of sufficient funds, simply failed to pay, the costs at issue. Between 1994 and 1997, Congress annually appropriated $1.277 billion to $1.419 billion to the IHS to execute the ISDA. 543 U.S. at 637. Justice Breyer, writing for the majority, recognized that these amounts far exceeded the amounts that the Tribes claimed *Id.* The congressional appropriations were in lump-sum amounts, without any statutory restrictions applicable to these claims. *Id.* at 637-38.

Justice Breyer explained that the government's ISDA contracts with the Tribes are akin to regular government procurement contracts. In the case of normal procurement contracts, when Congress appropriates sufficient legally unrestricted funds to pay contracts at issue as part of a lump-sum appropriation, the government is legally bound to pay those claims. *Id.* at 636. "[T]he Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum

appropriation is insufficient to pay all the contracts the agency has made." *Id.* at 637.

The Court rejected the government's attempt to avoid its obligations by arguing the self-determination contracts were "unique" and subject to "special treatment." *Id.* at 638-39. The Court recognized that many ISDA contracts include the phrase, "subject to the availability of appropriations," but noted that the phrase's purpose is not to give the government a way out of the contract, but rather to secure contracts that the parties negotiate in advance of Congressional appropriation, which, in pertinent years for the Tribes, Congress did appropriate. *Cherokee Nation*, 543 U.S. at 642 (quoting 25 U.S.C. § 450j-1(b)).

Since 1998, Congress has adopted a revised appropriation structure that is no longer a simple lump-sum appropriation with recommendations on the amount that IHS should expend on contract support costs. Beginning with 1998's fiscal year appropriation, Congress explicitly limited the amount that IHS could expend on contract support costs by imposing a "cap" directly in the appropriations act. *See Pueblo of Zuni*, 243 F.R.D. at 440. The *Cherokee Nation* Court did not address what liability the government might incur when there is a "capped appropriation for the total amount of funds owed to all ISDA contracts." *Id.* Finally, in addition to the availability of appropriations, HHS is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this Act. 25 U.S.C. §

450j-1(b). We now apply this statutory and regulatory scheme to the facts of this case.

D.    Procedural Background

Beginning on January 25, 2005, with the Tribe's submission of a proposal pursuant to 25 U.S.C. § 450f to contract for the administration of the Southern Ute Health Center, the parties engaged in correspondence, and subsequent negotiations, regarding the proposal. Over the course of the next eight months, the Tribe granted three extensions of the mandatory ninety-day term of decision to the IHS.

In the negotiations, HHS noted that there was a cap on funds that IHS could use to cover contract support costs, and that the HHS "appropriation does not include any funds for new or expanded program assumption by Indian Tribes." Rec. vol. II, doc. 14, at 303. HHS argued that language must be inserted into any new contract stating there are no contract support cost funds available for the Fiscal Year 2005. *Id*. at 303-04. Congress had "appropriated $263,638,000 to IHS to pay contract support costs and stated that money expended for contract support costs was not to exceed this amount. This amount does not represent sufficient money to pay contract support costs for any new or expanded program assumption under the [Act]." *Id.* at 293.

The Tribe in turn, refused to agree to the IHS's required additional restrictive language. The Tribe indicated that it was able to implement the

proposal for the Southern Ute Health Center "without the [contract support cost] funding, but would not waive the statutory right to the funding." *Id.* at 304.

On August 15, 2005, defendant director of the area, James L. Toya, sent a letter to the Tribe declining its proposal. The letter noted the five declination criteria from the ISDA, 25 U.S.C. § 450f(a)(2)(A) through (E) and lists (A), (C), (D), and (E) as the bases for declination. As the district court noted,

> in explaining this declination, [Mr.] Toya noted that [the Tribe] was refusing to recognize in the contract that [contract support costs are] not available and that this has the effect of meeting criteria (C), (D), and (E). [Mr.] Toya then concluded that criteria (A) was met because [the Tribe] had not shown it would be able to operate and maintain the programs and provide satisfactory services without [contract support cost] funds. The letter then lists an additional twelve reasons the proposal would have been declined even if [the Tribe] had agreed to the [contract support costs]. *There is no evidence in the record that any of these twelve issues had been discussed with* [*the Tribe*] *during negotiations.*

Rec. vol. II, doc. 14, at 304 (emphasis supplied).

After sending a response letter declaring the declination unlawful, in September 2005, the Tribe filed a complaint for damages and preliminary and permanent injunctive relief in federal court, which also alleged a violation of the Administrative Procedure Act. HHS sought summary judgment, and the parties agreed to consolidate the motion for preliminary injunction with the merits of the case. The district court treated the parties' respective motions as cross-motions for summary judgment.

The district court rejected the HHS declination, noting that a lack of sufficient congressional appropriations does not supplant the agency's statutory obligations and concluding that HHS could not condition its approval of the contract based on language absent from the statutory model agreement. Further, the district court recognized that the model agreement, required to be part of a contract, also contains a provision making the contracts "subject to the availability of appropriations," which should allay the HHS concerns. 25 U.S.C. § 450l(c); Rec. vol. II, doc. 14, at 308.

The district court thus rejected the HHS reasons for declining the contract. The district court granted summary judgment to the Tribe on its first two claims. The court ordered the Tribe to prepare a draft order of injunctive relief for the parties to sign. If the parties could not agree as to the order, the Tribe could seek a presentment hearing. Rec. vol. II, doc. 14, at 314. The district court noted that the Tribe's Administrative Procedure Act claim and damages were "remaining issues." *Id.* at 315.

The court acknowledged that "[HHS] is between a rock and a hard place if it has no discretion to decline contracts, no discretion to pay less than full [contract support costs] on all outstanding contracts, and receives inadequate appropriations to meet its obligations." *Id.* at 312-13. The district court alluded to the Supreme Court's suggestions in *Cherokee Nation*, that the government's obligation to pay contract support costs may be different when there are no

-11-

unrestricted funds available to pay them.  *Id.* (citing 543 U.S. 631, 643).

However, the Court also noted that the government must refrain from "making less essential contractual commitments" and "protect funds needed for more essential purposes" so as to avoid making commitments it cannot fulfill.  543 U.S. at 642.  But "[t]he [g]overnment cannot speculate that the Supreme Court will require it to pay obligations for which there are no unrestricted funds available and the Government cannot . . . engage in self-help statutory amendment to avoid the anticipated result of such a decision."  Rec. vol. II, doc. 14, at 313.

After the grant of summary judgment, the parties could only partially agree on a form of order for injunctive relief.  The Tribe submitted a contract containing certain statutory model language, but refused to include the HHS proposed language that HHS currently could not pay contract support costs.  The Tribe submitted a motion requesting a presentment hearing; it also indicated the contract's starting date would be October 1, 2005, which was the date originally proposed, according to the Tribe.  Rec. vol. II, doc. 15.

HHS filed a motion for clarification and suggested language that "would reflect that defendants currently owe the tribe $0 in contract support costs (on the basis that the tribe has not incurred any costs, and because no funds are available to be dispersed); that the [contract support costs] amount reflecting plaintiff's required [contract support costs] will be calculated; but in view of the congressional earmark for [contract support costs], the amount will be placed on

-12-

the shortfall list for payment if and when funding becomes available." Govt's Jurisd. Br. at 22 (quoting Rec. vol. II, doc. 19, at 394). As to the start date, HHS argued the October 1, 2005, start date made little sense as the Tribe had provided no health care services as of that date, and would not incur costs until (at the earliest) the contract's execution.

In its Second Order, the district court sided with HHS. The court determined that the ISDA did not prohibit that HHS version of the terms for the annual funding agreement. The Tribe would be paid $0 now, would be placed on the "shortfall list," and would be paid contract support costs if and when funds became available. *Id.* at 394. The court noted that the omission of such language would compel HHS to enter a contract that it must immediately breach, "opening the door to unwinnable – and perhaps frivolous – breach of contract claims." *Id.* at 397.

The court denied the Tribe's motion for a presentment hearing, granted the HHS motion for clarification, and ordered that the following occur:

> (1) the Parties shall meet and resume obligations for entering a self-determination cont[r]act which includes a start date of the date the Tribe undertakes operation of the Southern Ute Health Clinic;
> (2) the contract will include [the Secretary's] version of the Annual Funding Agreement language which is described [in this Order];
> (3) the Southern Ute Indian Tribe will be placed immediately on [the Secretary's] shortfall list, which [the Secretary has] represented it will do, and which [the Secretary] represent[s] allows payment on the basis of need;

(4) Within six **(6)** weeks of the date of this [Order], parties shall complete negotiations and submit a form of order for injunctive relief to the court, . . . .

And (5) that within the six week period allowed for renegotiating the self-determination contract, parties shall advise the court regarding the status of [the Tribe's] Third Count in the Complaint, alleging a violation of the Administrative Procedure[] Act.

Rec. vol. II, doc. 19, at 398-99. The Tribe determined it would not participate in negotiations and filed this appeal.

## II. Discussion

Before we can turn to the merits, we must determine whether we have jurisdiction to hear the Tribe's appeal. *See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 (10th Cir. 1989). Generally, we are limited to consideration of final orders that are accompanied by the entry of judgment. *See id.*; 28 U.S.C. § 1291.

However, § 1292(a)(1) provides that courts of appeal shall have jurisdiction to hear matters arising from orders "granting, continuing, modifying, refusing, or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). The district court's Second Order is clearly not a final order that resolves the case. Thus, we must examine it more closely to determine whether it constitutes an order granting an injunction that is appealable under § 1292(a)(1).

As to this issue, the Tribe argues that the district court's Second Order (a) expressly granted injunctive relief; (b) had the practical effect of granting injunctive relief; and (c) modified previously ordered injunctive relief. HHS

-14-

disagrees as to each point. We hold that the Second Order neither expressly granted relief, nor had the practical effect of granting injunctive relief, nor modified the court's First Order. We are therefore without jurisdiction to consider the Tribe's premature appeal.

A.      The Second Order Did Not Expressly Grant Injunctive Relief.

The Tribe argues that the district court's Second Order expressly granted injunctive relief because it compelled the parties to act. To recap, in the First Order, the district court found that HHS could not shirk its obligation to enter into the self-determination contract. In so doing, the district court combined the injunctive relief and its review of the merits, and granted summary judgment to the Tribe, at least in part (on claims 1 and 2, that (1) HHS had an obligation to enter the contract, and (2) HHS wrongfully declined the contract).[2] The Tribe was not aggrieved by the First Order, and thus could not (and did not) appeal from it. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980).

After the issuance of the First Order, the parties could not agree to the form of injunctive relief, which the district court directed the parties to draft. According to the Tribe, the Second Order compelled obedience under the threat of contempt because it enjoined the parties to meet and negotiate a contract with a

---

[2] The court also noted that the Tribe's third claim, which involved an Administrative Procedure Act violation claim, the Tribe asserted that the requirement that any IHS contract indicate that contract support costs were not available, was deemed a "remaining issue[]," along with damages. Rec. vol. II, doc. 14, at 315.

set start date (the date the Tribe begins to operate the clinic) and with its prescribed contract support costs language. Thus, the Tribe maintains, the Second Order compelled the parties to complete negotiations within six weeks.

HHS responds that the district court's Second Order addressed only the process of litigation, which is not in and of itself an appealable order. A non-final order generally is not subject to interlocutory appeal under § 1292(a)(1), if it is not directed to the merits of the underlying action. *See, e.g., Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988) ("An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)."); *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir. 1979) (holding that where "[t]he district court's order . . . regulates the conduct of discovery" and, thus, "is merely a step in the litigation process and is in no way directed to the merits of the underlying action[,] . . . the order is not appealable under § 1292(a)(1)"), *overruled in part on other grounds*, 773 F.3d 561 (4th Cir. 1985).

We agree with HHS that the Seventh Circuit's decision in *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994), is compelling. There, the plaintiffs sought a declaratory judgment and an injunction, and the court filed an order stating the plaintiffs were entitled to relief, but did not enter a judgment

-16-

specifying that relief. The court entered an order to "do something" and to "proceed with all deliberate speed." *Id.* The court explained that:

> although it may be characterized as an order to do something, it is no more an "injunction" than is an order to turn over papers in discovery or submit to a physical examination. *Only orders awarding relief on the merits, or effectively foreclosing some element of relief, may be appealed as injunctions.*

*Id.* (emphasis supplied).

The Tribe was obviously unsatisfied with the relief the district court ordered in the Second Order, and was discouraged by the multi-year unsuccessful negotiation process it had undergone with HHS, but its dissatisfaction cannot transform the Second Order into one granting express injunctive relief. Accordingly, we hold that the court's Second Order was not a form of express injunctive relief under 28 U.S.C. § 1292(a)(1).

B.     The Second Order Did Not Have the Practical Effect of Granting Injunctive Relief.

Next, the Tribe argues that the district court's First Order, which granted summary judgment and directed injunctive relief, together with the Second Order, had the practical effect of granting injunctive relief. The Tribe maintains that the Second Order specified that the parties enter into the self-determination contract through specific means. In addition, the Second Order declared a start date and a contract support costs provision to which the Tribe must agree. Thus, under this theory, the Second Order is enforceable by contempt, and in addition, the district court's orders constituted a decision on the merits – the court ordered the parties

-17-

to enter into a self-determination contract containing certain terms. But piecemeal orders like this one are not generally appealable unless they produce irreparable consequences requiring immediate appeal. *See Boughten v. Cotter Corp.*, 10 F.3d 746, 748 (10th Cir. 1993) (noting "the burden on appellate courts imposed by fragmentary and piecemeal review of the district court's myriad rulings in the course of a typical case").

"[I]n the case of orders that do not, as a technical matter, grant or refuse an injunction, but are injunctive in practical effect, or in practical effect deny an injunction, appealability depends upon the threat of [imminent] serious, perhaps irrevocable harm." *Hutchinson v. Pfeil*, 105 F.3d 566, 569 (10th Cir. 1997) (quoting 9 James W. Moore, *et al.*, *Moore's Federal Practice* ¶ 110.20[1] (2d ed. 1996)) (alterations in original) (internal quotations omitted). "Where a district court grants partial summary judgment against a plaintiff who has sought injunctive relief we believe that amounts to a practical denial of injunctive relief, and thus an interlocutory appeal may be taken pursuant to § 1292(a)(1) only upon a showing of harm as required by [the Supreme Court in] *Carson* [*v. American Brands, Inc.*, 450 U.S. 79 (1981).]" *Id.* at 570.

In *Carson*, the Supreme court cautioned:

[F]or an interlocutory order to be immediately appealable under § 1292(a)(1), . . . a litigant must show more than that the order has the practical effect of refusing an injunction. Because § 1292(a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that appeal as of right under § 1292(a)(1) will be available only in circumstances where

an appeal will further the statutory purpose of [permitting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence. Unless a litigant can show that an interlocutory order of the district court *might have a "serious, perhaps irreparable, consequence," and that the order can be "effectually challenged" only by immediate appeal*, the general congressional policy against piecemeal review will preclude interlocutory appeal.

450 U.S. at 84 (emphasis supplied) (internal citation omitted). Thus "[t]o invoke § 1292(a)(1) jurisdiction here, the district court's [Second] Order 1) must have the practical effect of granting or denying injunctive relief, 2) must be one which will result in serious or irreparable consequences if executed, and 3) must be a directive which can be challenged effectively only through immediate appeal." *United States v. McVeigh*, 157 F.3d 813 (10th Cir. 1998); *Hutchinson*, 105 F.3d at 569.

1.    The Tribe Cannot Demonstrate Serious or Irreparable Harm.

Assuming the Tribe is correct that the Second Order has the practical effect of granting injunctive relief, we must consider the harm to the Tribe. As to irreparable harm, the Tribe contends that the district court's Second Order would force it to forgo the original 2005 contract award, because of the later start date. In addition, the Tribe is forced to forgo the contract support costs and there is no guarantee that term of "$0" would be viewed as anything but its voluntary waiver of the right to those costs. To force the Tribe to be bound by the agreement would arguably moot any challenge it might raise subsequently, and there is no

guarantee that a federal court would have any power to rescind the contract. The

Tribe argues these consequences are both serious and irreparable.[3]

As to the Tribe's argument that it would essentially waive any relief had it

not appealed and entered the contract, we believe the Tribe overstates the case.

As HHS points out, the Tribe could have proposed language stating that the

actual execution of the contract would be suspended subject to the parties'

exercise of their appeal rights. HHS reiterated this position at oral argument and

affirmed that it would not oppose the Tribe's maintenance of identical challenges

at that time. We hold that any harm the Tribe suffers is reparable and will not

result in serious harm that cannot be compensated.

> 2.     The Second Order is Not a Directive that Can Only be
>         Challenged by an Immediate Appeal.

Nor, for largely the same reasons, is this Second Order a directive requiring

immediate appeal, because the parties may suspend the execution of the contract

---

[3]     We note that the Tribe does not argue that it might suffer incalculable or serious costs from the now more than three-year deprivation of the self-determination contract, nor from its alleged inability to administer its own programs for its member. We remind HHS of its duty to:

> make best efforts to remove any obstacles which might hinder Indian tribes and tribal organizations including obstacles that hinder tribal autonomy and flexibility in the administration of such programs.

> It is the policy of the Secretary that the contractibility of programs under this Act should be encouraged.

25 C.F.R. § 900.3(1), (11). The HHS actions thus far might be read to violate at least the spirit of this rule.

and then exercise their appeal rights. At oral argument, HHS reiterated this point. Thus, the parties may effectively appeal the Second Order after the district court finalizes the injunction.

C.     The Second Order Clarifies, Rather than Modifies, the First Order.

Finally, as we noted, § 1292(a)(1) allows interlocutory appeal of orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). This court illuminated this exception in *Pimentel & Sons Guitar Makers v. Pimentel*, 477 F.3d 1151, 1153-54 (10th Cir. 2007). The *Pimentel* decision looked to the Seventh Circuit's test, which "examines whether the court's order actually *modified* the existing injunction or instead . . . , merely *clarified* or *interpreted* the prior injunction. Appellate courts do not have jurisdiction to review a district court order that merely interprets or clarifies, without modifying, an existing injunction." *Id.* (emphasis supplied).

The Tribe argues that the Second Order *changed* the terms of the contract outright and, therefore, changed the terms of the injunctive relief granted in the First Order. *See* Rec. vol. II, doc. 19, at 389 ("[The] parties have applied to the Court for resolution of certain issues which have impeded their ability to comply with the court's previous [first] order *granting injunctive relief* to [the Tribe].") (emphasis supplied). The Tribe argues that the legal relationship between the parties has changed. It claims that the First Order stated that HHS did not have

-21-

"discretion to condition approval of [the Tribe's] proposal on new contract language contradicting statutory model language or on [the Tribe's] waiver of funding specifically provided [by the ISDA]," *id.*, doc. 14, at 314, while the Second Order, in contrast, concluded that the HHS proposed language was "consistent with the statutory requirements of the ISDA or the model agreement language." *Id.* doc. 19, at 398.

Under *Pimentel*, the benchmark for when an order modifies an injunction is a high one. "[I]n attempting to discern interpretation from modification, . . . we should not analyze the injunction and the order in detail. To plunge into the details would collapse the jurisdictional inquiry into a decision on the merits, thwarting the purpose of § 1292(a)(1). . . . Consistent with the purposes of § 1292(a)(1), we ask only whether the District Court's conclusion is a gross or blatant misinterpretation of the original injunction." *Pimentel*, 477 F.3d at 1154-55 (internal quotation marks and citations omitted). The detailed analysis of both orders requested by the Tribe is inconsistent with this standard of review. Upon a general review, the First Order directed HHS to enter a contract. It did not set the amount for contract support costs or the start date. The Second Order, which fills in these terms, is not a "gross or blatant misinterpretation" of the First Order. *Id.* at 1155. Therefore, it does not modify the First Order as that term is used in § 1292(a)(1).

# III. CONCLUSION

We empathize with the plight of the Tribe in securing its self-determination, but, we cannot take jurisdiction where none is to be had.  We, like Congress,[4] acknowledge that the Tribe has a right to its self-determination, and hope that the parties will come to an agreement quickly.  Accordingly, because we do not have jurisdiction to review the merits of the Tribe's appeal, we dismiss the appeal.

---

[4]

> Congress has declared its commitment to the maintenance of the Federal Secretary's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a *meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.* In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal secretarys, capable of administering quality programs and developing the economies of their respective communities.

25 C.F.R. § 900.3(a)(2) (emphasis supplied).

> And Congress has a similarly stated policy for HHS:

> It is the policy of the Secretary to facilitate the efforts of Indian tribes and tribal organizations to plan, conduct and administer programs, functions, services and activities, or portions thereof, which the Departments are authorized to administer for the benefit of Indians because of their status as Indians. *The Secretary shall make best efforts to remove any obstacles which might hinder Indian tribes and tribal organizations including obstacles that hinder tribal autonomy and flexibility in the administration of such programs.*

*Id.* § 900.3(b) (emphasis supplied).