# Effect of Spending Prohibition on HUD's Satisfaction of Contractual Obligations to ACORN

Section 163 of division B ("Continuing Appropriations Resolution, 2010") of Public Law 111-68 does not direct or authorize the Department of Housing and Urban Development to breach a pre-existing binding contractual obligation to make payments to the Association of Community Organizations for Reform Now or its affiliates, subsidiaries, or allied organizations where doing so would give rise to contractual liability.

October 23, 2009

MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

You have asked whether section 163 of division B ("Continuing Appropriations Resolution, 2010") of Public Law 111-68, 123 Stat. 2023, 2053, approved by the President on October 1, 2009, prohibits the Department of Housing and Urban Development ("HUD") from making a payment to the Association of Community Organizations for Reform Now ("ACORN") or its affiliates, subsidiaries, or allied organizations to satisfy an existing contractual obligation that arose prior to the enactment of that measure. We conclude, in agreement with the views we solicited and received, that the language of section 163 is not clear with respect to whether its prohibition applies in cases where pre-existing law apart from section 163, including the contract itself, compels such a payment and where, accordingly, failure to make such a payment would subject the federal government to contractual liability. In accord with established interpretive principles for resolving such lack of clarity, we conclude that section 163 does not direct or authorize HUD to refuse payment on binding contractual obligations that predate the Continuing Appropriations Resolution.[1]

## I.

Section 163 states: "None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Commu-

---

[1] This opinion addresses only pre-existing contracts that create binding obligations requiring payment and not those that excuse payment in the relevant circumstances.

nity Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, or allied organizations." The term "provided to" has no established meaning in appropriations law. As explained by the GAO Redbook, "[t]he two basic authorities conferred by an appropriation law are the authority to incur obligations and the authority to make expenditures. An obligation results from some action that creates a liability or definite commitment on the part of the government to make an expenditure. . . . The expenditure is the disbursement of funds to pay the obligation." 1 General Accounting Office, *Principles of Federal Appropriations Law* 5-3 (3d ed. 2004) ("GAO Redbook"). Thus, "obligate" and "expend" are terms of art that generally describe the commitment and payment of funds. *See, e.g.*, 31 U.S.C. § 1341(a)(1) (2006) (Anti-Deficiency Act) (providing that no federal officer or employee may "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation"). The term "expenditure," in particular, is broadly defined as "[t]he actual spending of money; an outlay." Government Accountability Office, *A Glossary of Terms Used in the Federal Budget Process* 48 (2005) ("GAO Glossary"); *see also* 1 GAO Redbook at 5-3 ("The expenditure is the disbursement of funds to pay the obligation."). And an opinion by the Comptroller General suggests that the word "expenditure" in the Anti-Deficiency Act prohibits an agency from making a payment to satisfy a contractual obligation if a statutory or regulatory funding limitation would thereby be exceeded. *See In re Currency Exchange Rate Fluctuations*, 58 Comp. Gen. 46 (1978).

By contrast, as we have noted, the term Congress elected to employ in section 163, "provided to," has no clearly defined meaning in appropriations law. *See, e.g.*, GAO Glossary (containing no definition of "provision" or "provide"). Moreover, appropriations case law and reference materials we have consulted, including the GAO Redbook, do not shed light on whether "provided to" in section 163 should be understood to prohibit a federal agency from making payments to satisfy pre-existing contractual obligations.

To be sure, some common definitions of "provide," such as "supply" or "furnish," *American Heritage Dictionary* 1411 (4th ed. 2006), would appear to describe any transfer of funds, presumably including a transfer in satisfaction of an existing obligation. Other definitions, however, connote a discretionary action. For instance, "provide" may mean "con-

tribute," *Webster's New International Dictionary* 1994 (2d ed. 1958), or "make available," *American Heritage Dictionary* 1411 (4th ed. 2006), and "offer" is among its synonyms, *Roget's II: The New Thesaurus* 780 (3d ed. 1995). And in common parlance, the verb "provide" frequently describes discretionary action taken to benefit another. Moreover, several of the word's definitions incorporate a forward-looking aspect, *see, e.g.*, *Webster's New International Dictionary* 1994 (2d ed. 1958) ("to look out for in advance"; "to prepare"); *Black's Law Dictionary* 1224 (6th ed. 1990) ("[t]o make, procure, or furnish for future use, prepare"), consistent with the etymology of "provide," which derives from the Latin *providere*, meaning to see before, foresee, or be cautious, 12 *Oxford English Dictionary* 713 (2d ed. 1989). Definitions of the word "expend," we note, do not carry a similarly discretionary or forward-looking connotation, in keeping with the etymology of that word, which comes from the Latin *expendere*, meaning simply to pay or weigh. 5 *id.* at 561.

Against this background, we find that the relevant text of section 163 is not clear with respect to the precise question before us. Congress had available to it—and yet did not use—appropriations language that had previously been construed to prohibit payments even on pre-existing contractual obligations.[2] It instead used a term that could be read to suggest a bar only on payments that result from new discretionary decisions—including, in particular, payments made pursuant to discretionary choices to incur new obligations. Accordingly, although one could read the phrase "None of the funds made available by this joint resolution or any prior Act may be provided to [ACORN], or any of its affiliates, subsidiaries, or allied organizations" categorically to prohibit *any* outlay of money to the identified entities, including pursuant to pre-existing contractual obligations, one could also read the phrase not to prohibit payments made pursuant to a prior binding contractual duty.

## II.

In light of the term Congress chose, we turn to other interpretative tools to resolve the question before us. The recent Supreme Court case *Chero-*

---

[2] We do not address whether, if Congress had used the phrase "may be expended" in section 163, that phrase would necessarily prohibit payment pursuant to pre-existing legal obligations—a question that might depend at least in part on extratextual considerations.

*kee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005), is instructive. There, contracts between the government and Indian tribes provided that the tribes would supply health services normally furnished by the government and that the government would in turn pay the "contract support costs" the tribes incurred. The government subsequently refused to pay the full contract support costs because, it argued, Congress had not appropriated sufficient funds. Part of the government's argument rested on a later-enacted statute that stated: "Notwithstanding any other provision of law [the] amounts appropriated to or earmarked in committee reports for the . . . Indian Health Service . . . for payments to tribes . . . for contract support costs . . . are the total amounts available for fiscal years 1994 through 1998 for such purposes." *Id.* at 645 (quoting section 314 of the Department of the Interior and Related Agencies Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2682-232, 2681-288 (1998)). The Court noted that, because committee reports in 1994 through 1997 had earmarked funds for contract support costs, and because those funds had "long since been spent," this language was "open to the interpretation that it retroactively bars payment of claims arising under 1994 through 1997 contracts." *Id*. In the Court's view, however, the statutory language was also open to a different interpretation that would simply forbid the "use of unspent funds appropriated in prior years to pay unpaid 'contract support costs.'" *Id.* at 646. Thus, the Court concluded:

> On the basis of language alone we would find either interpretation reasonable. But there are other considerations. The first interpretation would undo a binding governmental contractual promise. A statute that retroactively repudiates the Government's contractual obligation may violate the Constitution. And such an interpretation is disfavored. This consideration tips the balance against the retroactive interpretation.

*Id.* (citations omitted); *see also Lynch v. United States*, 292 U.S. 571, 580 (1934) ("Congress was without power to reduce expenditures by abrogating contractual obligations of the United States."); *United States v. Winstar Corp.*, 518 U.S. 839, 875–76 (1996) (plurality opinion) ("[I]t is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights, [although the] extent of that capacity, to be sure, remains somewhat obscure.") (citations omit-

ted); *cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994) ("The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance.").

Reading section 163 to prohibit payments to ACORN or its affiliates, subsidiaries, or allied organizations to satisfy a binding contractual obligation undertaken before enactment of section 163 would "undo a binding governmental contractual promise." *Cherokee Nation*, 543 U.S. at 646. In accord with *Cherokee Nation*, the better reading of the section is therefore that it does not prohibit such payments. This reading of "provided to" is especially appropriate here because, consistent with the canon of constitutional avoidance, *see, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 483 U.S. 568, 575 (1988), it not only avoids abrogating binding governmental contractual promises but also avoids the particular constitutional concerns that may be presented by reading the statute, which applies to specific named entities, to abrogate such contracts, including even in cases where performance has already been completed but payment has not been rendered.[3]

---

[3] *See, e.g.*, *United States v. Lovett*, 328 U.S. 303, 315 (1946) ("[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."); *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 853 (1984) (stating that a particular provision imposed "none of the burdens historically associated with punishment" because "'the sanction is the mere denial of a *noncontractual* governmental benefit'") (emphasis added) (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475–76 (1977) ("[O]ur inquiry is not ended by the determination that the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause. Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee. The Court, therefore, often has looked beyond mere historical experience and has applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes."); *see also Consol. Edison Co. v. Pataki*, 292 F.3d 338, 346–49 (2d Cir. 2002) (applying the Bill of Attainder Clause to a bill that arguably singled out a corporation); *cf.* Kenneth R. Thomas, Cong. Research Serv., *The Proposed "Defund ACORN Act": Is it a "Bill of Attainder?"* (2009) (considering an earlier bill that would have, *inter alia*, prohibited the award of federal contracts or the provision of federal funds to a "covered organization,"

### III.

In sum, section 163 should not be read as directing or authorizing HUD to breach a pre-existing binding contractual obligation to make payments to ACORN or its affiliates, subsidiaries, or allied organizations where doing so would give rise to contractual liability.

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

with "organization" expressly defined as including ACORN and its affiliates, and concluding that "a court may have a sufficient basis to overcome the presumption of constitutionality, and find that the proposed [bill] violates the prohibition against bills of attainder").