FILED
United States Court of Appeals
Tenth Circuit

September 19, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

SOUTHERN UTE INDIAN TRIBE,

     Plaintiff-Appellant/Cross-Appellee,

v.

KATHLEEN SEBELIUS, Secretary of the
United States Department of Health and Human
Services; RICHARD H. CARMONA, Surgeon
General of the United States; CHARLES W.
GRIM, Assistant Surgeon General and Director
of the Indian Health Service; JAMES L.
TOYA, Director, Albuquerque Area Office of
the Indian Health Service; UNITED STATES
INDIAN HEALTH SERVICE; UNITED
STATES PUBLIC HEALTH SERVICE;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

     Defendants-Appellees/Cross-Appellants.

No. 09-2281 & 09-2291

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:05-CV-00988-WJ-LAM)**

---

Steven C. Boos of Maynes, Bradford, Shipps & Sheftel, LLP, Durango, Colorado
(Monte Mills of Southern Ute Indian Tribe Legal Department, Ignacio, Colorado,
with him on the briefs), for Plaintiff-Appellant/Cross-Appellee.

Jeffrica Jenkins Lee, Attorney, Civil Division (Tony West, Assistant Attorney
General; Gregory J. Fouratt, United States Attorney; and Barbara C. Biddle,

Attorney, Civil Division, with her on the briefs), Department of Justice, Washington, D.C., for Defendants-Appellees/Cross-Appellants.

Before **MURPHY**, **SEYMOUR** and **O'BRIEN**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

This is the second appeal in litigation arising from the Secretary of Health and Human Services' ("HHS") decision not to enter into a self-determination contract with the Southern Ute Indian Tribe ("Tribe"). In an initial order, the district court ruled that HHS's decision was unlawful, granted summary judgment to the Tribe, and directed the parties to prepare a proposed order for injunctive relief. *See Southern Ute Indian Tribe v. Leavitt* (*Southern Ute I*), 497 F. Supp. 2d 1245 (D.N.M. 2007). After the parties were unable to agree on the proposed order, the district court issued an interlocutory order in which it endorsed HHS's approach to the contract's start date and contract support costs. *See Southern Ute Indian Tribe v. Leavitt*, Mem. Op. & Order Following Presentment H'rg (*Southern Ute II*), Civil No. 05-988 WJ/LAM (D.N.M. Oct. 18, 2007). The Tribe appealed, and we dismissed the appeal for lack of jurisdiction. *See Southern Ute Indian Tribe v. Leavitt* (*Southern Ute III*), 564 F.3d 1198 (10th Cir. 2009). On remand, the district court issued a final order, directing the parties to enter a self-determination contract including HHS's proposed language regarding the contract

-2-

start date and contract support costs, and denying the Tribe's request for damages. *See Southern Ute Indian Tribe v. Leavitt* (*Southern Ute IV*), Civil No. 05-988 WJ/LAM (D.N.M. Sept. 16, 2009).

Both parties appeal. We affirm the district court's determination that HHS was required to contract with the Tribe and regarding the contract start date, but reverse regarding contract support costs.

I.

The statutory and factual background underpinning this litigation is set forth in detail in our prior decision. *Southern Ute III*, 564 F.3d at 1200-06. We repeat here only those details necessary to understand our disposition.

A.

The Indian Self-Determination and Education Assistance Act ("ISDA") directs the Secretary of HHS (the "Secretary"), upon request of an Indian tribe, to enter into a contract by which the tribe assumes direct operation of HHS's federal Indian health care programs for the tribe's members. 25 U.S.C. § 450f. Congress provided for these self-determination contracts in an effort to encourage self-government and thereby enhance the progress of Indian people and their communities. *See id.* §§ 450, 450a. The ISDA derives from "the Federal

-3-

Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole." *Id.* § 450a(b). "It pursues a goal of Indian 'self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.'" *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1058 (10th Cir. 2011) (quoting 25 U.S.C. § 450a(a)).

Under the ISDA, the Secretary must approve a Tribe's contract proposal unless he or she makes a "specific finding that clearly demonstrates or . . . is supported by a controlling legal authority" that one or more of the statutory grounds for declination are met. 25 U.S.C. § 450f(a)(2)(A)-(E) (specifying grounds on which the Secretary may decline to enter a self-determination contract). Under one of these grounds, at issue here, the Secretary may decline a Tribe's contract proposal if "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract . . . ." *Id.* § 450f(a)(2)(D).

Once the Secretary enters into a self-determination contract, the ISDA directs the Secretary to provide two types of contract funding. The first is the "secretarial amount," which is the amount of funding Congress would have provided HHS to operate the programs had they not been turned over to the tribe. *Id.* § 450j-1(a)(1). The second type of funding, which is at issue here, is for

-4-

"contract support costs" ("CSCs"). *Id.* § 450j-1(a)(2). Soon after the ISDA was enacted, Congress recognized that limiting contract funding to the secretarial amount created a "serious problem" because those funds did not cover ancillary costs of federally-mandated administrative requirements faced by contractor tribes. S. Rep. No. 100-274, at 8 (1987), *reprinted in* 1988 U.S.C.C.A.N. 2620, 2627. To address this concern, Congress amended the ISDA to require the Secretary to provide full funding for CSCs to cover "the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ." 25 U.S.C. § 450j-1(a)(2); *see also* Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205, 102 Stat. 2285, 2292-94 (1988); *Ramah Navajo Chapter*, 644 F.3d at 1058.

The Secretary's obligation to fund self-determination contracts is not absolute. The ISDA includes an "availability clause," which states that the Secretary's payment of funds to contractor tribes is "subject to the availability of appropriations." 25 U.S.C. § 450j-1(b); *see also id.* § 450j(c)(1) ("The amounts of [self-determination] contracts shall be subject to the availability of appropriations."). The statute also provides that the Secretary may not reduce funding to tribes with ongoing contracts, absent a reduction in appropriations or other special circumstances. *See id.* § 450j-1(b)(2); *see also id.* § 450j-1(b) (stating that "the Secretary is not required to reduce funding for programs,

projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this [Act]").

Every self-determination contract must also contain or incorporate by reference the provisions of the "model agreement" prescribed by the ISDA and "such other provisions as are agreed to by the parties." 25 U.S.C. § 450*l*(a). The model agreement states that the contract shall attach and incorporate by reference an "annual funding agreement." *Id.* § 405*l*(c) (model agreement § 1(f)). That agreement sets forth the negotiated annual CSC amounts associated with the contract, *id.* (model agreement §§ 1(b)(4), 1(c), 1(f)(2)(A)), and the "time and method of payment," *id.* (model agreement § 1(f)(2)(A)(i)).[1] It also reiterates that the Secretary's payment of amounts specified in the annual funding agreement is "subject to the availability of appropriations." *Id.* (model agreement § 1(b)(4)).

The fact that the Secretary's payment of CSCs is subject to the availability of appropriations is important in light of Congress's funding decisions. In fiscal year 1994, Congress began capping CSC funding. *Ramah Navajo Chapter*, 644 F.3d at 1059. Because of these caps, aggregate shortfalls in CSC funding have been ubiquitous, leaving the HHS with insufficient funds to pay full CSCs under both ongoing and new contracts. *See id.* (noting "funding shortfalls for CSCs

---

[1] The annual funding agreements are renegotiated each year. *Ramah Navajo Chapter*, 644 F.3d at 1060; *see also* 25 U.S.C. § 450*l*(c) (model agreement §§ 1(b)(4), 1(b)(14)). The CSC amounts in the agreements, therefore, are likely to change over the course of multi-year contracts. *See id*. § 450j(c)(1).

were repeated every fiscal year from 1994-2001); *see also Interior, Environment, and Related Agencies Appropriations for 2011: Hearings Before the Subcomm. on Interior, Environment, and Related Agencies of the H. Comm. on Appropriations*, 111th Cong. 229-31 (2010) (statement of Lloyd B. Miller, Counsel, National Tribal Contract Support Cost Coalition) (noting shortfalls through 2011).

The ISDA includes remedial provisions. Relevant here, it gives United States district courts jurisdiction to hear tribal claims against the Secretary for actions taken contrary to the ISDA. 25 U.S.C. § 450m-1(a). The district courts have authority to "order appropriate relief including money damages, injunctive relief against [the Secretary] . . . or mandamus . . . to compel the Secretary to award and fund an approved self-determination contract." *Id.* The ISDA also provides that self-determination contracts are subject to the Contract Disputes Act of 1978, 41 U.S.C. § 601. *Id.* § 450m-1(d). The CDA provides a process for tribes seeking to recover contract funds when the Secretary refuses to pay them. *Id.*; *see also Indian Health Manual: Contract Support Costs* 6-3.4f (2007) (noting CDA claim as a preferred method for resolving disputes over CSCs).

Such litigation has led to decisions by the Supreme Court and this court about the Secretary's obligation to pay CSCs to tribes under *existing* contracts in the face of chronic shortfalls in CSC funding. *See Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005); *Ramah Navajo Chapter*, 644 F.3d 1054. This appeal, by contrast, requires us to consider the Secretary's obligations in deciding

-7-

whether and how to enter into *new* contracts.

B.

On January 31, 2005, the Tribe submitted a proposal to enter into a self-determination contract to assume control of the Southern Ute Health Center (the "Clinic"), beginning on May 1, 2005. This initiated protracted negotiations, and on July 13, 2005, the Tribe submitted a final, amended contract proposal in which it sought to assume control of the Clinic on October 1, 2005.[2]

During the negotiations, HHS expressed concerns that it lacked funds to pay the Tribe's CSCs. In February 2005, the month after the Tribe submitted its initial contract proposal, for example, HHS sent the Tribe a letter stating that it was continuing to review the Tribe's proposal for CSCs, but cautioning that "Congress failed to add any new money to the CSC appropriation this year and therefore it is very unlikely that any pre-award or startup costs will be paid for [fiscal year] 2005 program assumptions." App., vol. I at 105-06. The appropriations act for fiscal year 2005 provided that

> not to exceed $267,398,000 shall be for payments to tribes and tribal organizations for contract . . . support costs associated with contracts . . . or annual funding agreements between [the Secretary] and a tribe or tribal organization prior to or during fiscal year 2005, of which

---

[2] Although HHS was required to approve or decline the Tribe's proposal within ninety days, 25 U.S.C. § 450f(a)(2), the Tribe consented to several extensions of the ninety-day deadline at HHS's request.

> not to exceed $2,500,000 may be used for contract support costs associated with new or expanded self-determination contracts . . . or annual funding agreements . . . .

Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3084 (2004). The appropriation represented no increase from fiscal year 2004 and left a shortfall in funds to pay CSCs under existing contracts.[3] Citing its obligation not to reduce funding to Tribes with ongoing contracts, 25 U.S.C. §§ 450j-1(b)(2), 450j(i), HHS allocated its entire fiscal year 2005 CSC appropriation to existing contracts, which left no CSC funds for new contracts.

In June 2005, HHS informed the Tribe that it had adopted a new policy of requiring all tribes seeking to enter into new self-determination contracts to include language in their contracts making clear that HHS "will not pay CSC, does not promise to pay CSC, that the tribes cannot rely on any promise to pay, and tribes cannot report a failure to receive CSC as a shortfall." *Southern Ute I*, 497 F. Supp. 2d at 1250. The Tribe refused to agree to this language. The Tribe instead submitted amendments to its proposal on July 13, 2005 confirming that although it would not agree to HHS's proposed caveats, it nevertheless sought a contract to begin operating the Clinic on October 1, 2005. On August 15, 2005, HHS rejected the Tribe's proposal, including the amendments submitted by the

---

[3] After rescissions, the actual amount appropriated for CSCs in fiscal year 2005 was $263,683,179. The requirement that "not to exceed $2,500,000" be used to fund CSCs under new or expanded contracts, however, did not change.

Tribe on July 13.  HHS declined the proposal on the ground that the Tribe refused to recognize that there were no CSC funds available for the contract, and there might not be any CSC funds available in the future.

After informing HHS that its declination decision was unlawful, the Tribe filed this action seeking preliminary and permanent injunctive relief reversing HHS's declination of its contract proposal; it also sought damages.  The Tribe alleged that insufficient funding was not a basis for declining to contract pursuant to the ISDA, and that it had a right not to agree to HHS's proposed CSC language, which differed from the ISDA's model contract.[4]  In response, HHS moved for summary judgment.  The parties agreed to consolidate the motion for preliminary injunction with the merits of the case, and the district court treated the parties' respective motions as cross-motions for summary judgment.

On June 15, 2007, the district court issued an order siding with the Tribe. It held that HHS "did not have discretion to decline [the Tribe's] proposal on the basis of insufficient Congressional appropriations to pay CSC and did not have discretion to condition approval of [the Tribe's] proposal on new contract language contradicting statutory model language or on [the Tribe's] waiver of funding specifically provided under the [ISDA]."  *Southern Ute I*, 497 F. Supp. 2d

---

[4] The complaint also alleged a violation of the Administrative Procedure Act ("APA").  The APA claim ultimately was dismissed and has not been appealed.

at 1257. The court granted summary judgment and injunctive relief to the Tribe, reversing HHS's refusal to contract. *Id*. It ordered the parties to prepare a proposed injunctive order.

In preparing the order, the parties could not agree on two issues. First, HHS continued to press the Tribe to agree to language indicating that HHS did not have enough funds to pay the Tribe's CSCs. The Tribe refused, maintaining that the proposed CSC language was akin to the language that prompted the Tribe to litigate in the first place and did not conform to terms of the ISDA's model agreement. The second issue concerned the contract start date. The Tribe maintained that the start date should be October 1, 2005, the date listed in its final contract proposal, while HHS asserted it should be the date on which the Tribe would begin to operate the Clinic under the contract.

Having reached an impasse, the Tribe submitted a motion for a hearing, along with a proposed writ of mandamus stating that the contract's start date would be October 1, 2005. In response, HHS filed a motion for clarification and suggested language that

> would reflect that defendants currently owe the tribe $0 in contract support costs (on the basis that the tribe has not incurred any costs, and because no funds are available to be dispersed); that the [contract support costs] amount reflecting plaintiff's required [contract support costs] will be calculated; but in view of the congressional earmark for [contract support costs], the amount will be placed on the shortfall list for payment if and when funding becomes available.

*Southern Ute III*, 564 F.3d at 1205 (alterations in original). HHS also argued that

-11-

an October 1, 2005 start date made no sense because the Tribe had not yet assumed control of the Clinic.

On October 18, 2007, the district court issued an order endorsing HHS's proposed CSC language and start date. It held that the contract's start date "will be the date on which the Tribe begins the operation of the Clinic," rather than the October 1, 2005 date listed in the Tribe's final proposal. *Southern Ute II* at 6. Accepting HHS's position that it lacked funds to pay the Tribe's CSCs, the district court also held that "the Tribe is not entitled to full and immediate payment of all costs and expenses." *Id.* at 10. Relying on this rationale, it approved HHS's proposed language indicating that HHS "currently owed" the Tribe $0 in CSCs and that the Tribe would be placed on the shortfall list and given funding if and when it becomes available. Accordingly, the court denied the Tribe's motion for a writ of mandamus, granted HHS's request for clarification, and ordered the parties to resume and complete negotiations for a contract containing HHS's proposed CSC language and contract start date.

Rather than resume negotiations, the Tribe appealed the district court's second order to this court. Because we concluded the order was not a final, appealable decision, we dismissed the appeal for lack of jurisdiction and remanded for further proceedings. *Southern Ute III*, 564 F.3d at 1210.

The district court thereafter issued a final order in which it directed the parties to execute a self-determination contract consistent with its prior orders. It

-12-

also denied the Tribe's request for damages. *Southern Ute IV* at 10-11. The parties then executed a self-determination contract which listed a start date of October 1, 2009. Pursuant to the district court's order, they also executed an annual funding agreement which was incorporated into the contract, stating:

> B. <u>Contract Support Costs</u>: The Secretary currently owes the Tribe $0 in CSC funds . . . . The parties have calculated Southern Ute Indian Tribe's annual CSC . . . to be $1,262,562.00 . . . . [HHS] will place the amount on the annual Shortfall Report. If and when Congress appropriates additional funding, [HHS] will amend the AFA to add funding according to [HHS's] policy . . . .

App., vol. II at 480. In entering the agreement, the parties reserved their rights to appeal "any final order . . . affecting the terms of th[e] Contract." *Id.* at 480.

The Tribe now appeals the district court's order requiring the use of HHS's proposed CSC language and contract start date. HHS cross-appeals the district court's initial ruling that HHS was required to contract with the Tribe. It asks us to reverse the court's grant of summary judgment to the Tribe or, alternatively, to affirm the court's order regarding the CSC language and contract start date.

II.

We have jurisdiction under 28 U.S.C. § 1291 and review *de novo* the district court's grant of summary judgment and construction of the ISDA. *See Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006); *Atl. Richfield Co. v. Farm Credit*

*Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). "A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law." *Ramah Navaho Chapter*, 644 F.3d at 1062 (citing *Atl. Richfield Co.*, 226 F.3d at 1148).

In construing the ISDA, we begin with its text. *Id.* (citing *Chickasaw Nation v. United States*, 208 F.3d 871, 876 (10th Cir. 2000)). "If the terms of the statute are clear and unambiguous, they are controlling absent rare and exceptional circumstances." *Id.* (internal quotation marks omitted). "We also take into account the broader context of the statute as a whole when ascertaining the meaning of a particular provision." *Id.* (internal quotation marks omitted). "If a statute is ambiguous, we look to traditional canons of statutory construction to inform our interpretation." *Id.* (internal quotation marks omitted). One such canon is the one favoring Native Americans: "[I]f the [ISDA] can reasonably be construed as the Tribe would have it construed, it must be construed that way." *Id.* (internal quotation marks omitted). This canon of construction controls over more general rules of deference to an agency's interpretation of an ambiguous statute. *Id.*

A.

We begin with HHS's challenge to the district court's determination that HHS lacked discretion to decline the Tribe's contract proposal. HHS claims it

properly declined to contract with the Tribe because, at the time the Tribe submitted its initial contract proposal, HHS had already obligated its entire fiscal year 2005 CSC appropriation to pre-existing contracts, thus leaving "no remaining unrestricted appropriations from which [it] could agree to pay new CSC to the Tribe." Aple. Br. at 27. HHS argues its decision to decline the Tribe's proposal was authorized by the ISDA, the Anti-Deficiency Act, 31 U.S.C. § 1341, and the Appropriations Clause, U.S. Const., art. I, § 9, cl. 7. We consider each in turn.

1.

Relying on the ISDA, HHS contends the Secretary may decline a tribe's proposal to contract if "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract." 25 U.S.C. § 450f(a)(2)(D). It argues that this statutory ground for declination was satisfied because the Tribe's proposal requested CSC in excess of "available" appropriations for fiscal year 2005.

There is no question the ISDA authorizes HHS to decline to enter into a self-determination contract if it makes a "specific finding that clearly demonstrates . . . or is supported by a controlling legal authority that . . . the amount of funds proposed under the contract is in excess of the applicable funding level for the contract." 25 U.S.C. § 450f(a)(2)(D). The question posed in this appeal is whether this provision permits HHS to decline a contract on the basis that available appropriations are insufficient to fund the contract. We hold that it does

-15-

not.

In urging the contrary conclusion, HHS relies on the ISDA's availability clause, which provides: "Notwithstanding any other provision of [the ISDA], the provision of funds under [the ISDA] is subject to the availability of appropriations . . . ." *Id*. § 450j-1(b); *see also id.* § 450j(c)(1) ("The amounts of [self-determination] contracts shall be subject to the availability of appropriations."). HHS argues that because its payment of contract funds is subject to the availability of appropriations, the "applicable funding level for a contract" must refer to the amount of appropriations available to fund that contract. Accordingly, HHS contends, it had discretion under § 450f(a)(2)(D) to decline the Tribe's proposed contract because available appropriations were insufficient to allow HHS to pay the amount of CSCs stated in the Tribe's proposal. We disagree.

As an initial matter, the Tribe's proposal, which HHS declined, did not request CSCs for fiscal year 2005. As stated above, the Tribe initially sought funds to begin operating the Clinic on May 1, 2005, but then amended its proposal to begin operations on October 1, 2005, the first day of fiscal year 2006. HHS's focus on fiscal year 2005 appropriations, therefore, is misguided. Whether HHS's appropriations were available to fund the Tribe's proposal depended entirely on

-16-

appropriations for fiscal year 2006.[5]  That HHS had allocated its entire CSC

appropriation for fiscal year 2005 to other contracts is thus of no consequence.

In any event, HHS's interpretation of § 450f(a)(2)(D) belies the plain text of

the statute. The meaning of "applicable funding level" is not open to broad

interpretation but is instead specifically defined by cross-reference to § 450j-1(a).

Under the ISDA, the Secretary may decline a contract if "the amount of funds

proposed under the contract is in excess of the applicable funding level for the

contract, *as determined under section 450j-1(a)* of [the ISDA]."  *Id.*

§ 450f(a)(2)(D) (emphasis added).  Section 450j-1(a), in turn, does not mention

appropriations, but instead describes the two types of contract funding discussed

above – the secretarial amount and CSCs – which together constitute the "amount

of funds provided under the terms of the self-determination contracts."  *Id.*

§ 450j-1(a)(1).  With respect to CSCs, it declares that "[t]here *shall* be added to

_____

[5] As even the Tribe conceded at oral argument, payment of CSCs, including
pre-award costs, is not due until the contract's start or "effective" date.  *See* 25
U.S.C. § 450*l*(c) (model agreement § 1(b)(2)) (providing that contract does not
become effective until after start date); *id.* (model agreement § 1(b)(6))
(providing that parties must agree on method and timing of payment, and noting
that when a contract year coincides with a fiscal year, no quarterly payments are
due until ten days *after* appropriations are apportioned by the Office of
Management and Budget); *see also Ramah Navajo Chapter*, 644 F.3d at 1076
(noting that "self-determination contracts become effective upon the date of the
approval and execution by the Contractor and Secretary") (quoting 25 U.S.C.
§ 450*l*(c) (model agreement § 1(b)(2)); *cf. Indian Health Manual: Contract
Support Costs* 6-3.3 (2007) (detailing HHS's multi-step process for allocating and
transferring CSC amounts to contractor tribes).

[the secretarial amount] contract support costs which *shall* consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ." *Id.* § 450j-1(a)(2) (emphasis added). Accordingly, the plain language of the statute dictates that as long as a tribe's proposed CSCs do not exceed the "reasonable costs" of complying with "the terms of the contract and prudent management," *id.*, the Secretary may not decline a contract proposal for exceeding the "applicable funding level" for CSCs, *id.* § 450f(a)(2)(D). The applicable funding level for CSCs must be evaluated irrespective of whether the appropriations available to HHS are sufficient to pay that amount.[6]

The ISDA's availability clause does not alter this result. Although the clause makes clear that the "*provision of funds* under [the ISDA] is subject to the availability of appropriations," *id.* § 450j-1(b) (emphasis added), it says nothing about the declination of contracts. We see no convincing reason to read this clause into the declination criteria set forth in a different part of the ISDA, *see id.* § 450f(a)(2)(A)-(E), and therefore agree with the district court that this "availability of appropriations" language cannot form the basis for declining a

_____

[6] Having held that the Secretary may not decline a contract under § 450f(a)(2)(D) because of insufficient CSC funds, we need not decide whether "available" appropriations were, in fact, insufficient to cover the Tribe's CSCs for fiscal year 2006 or any other year.

-18-

self-determination contract under § 450f(a)(2)(D).  The ISDA plainly does not authorize HHS to decline the Tribe's contract proposal on the basis that it lacked sufficient appropriations to cover the CSCs requested by the Tribe, the amount of which HHS does not contend is unreasonable.[7]

2.

HHS next contends its decision to decline the Tribe's contract proposal was justified, if not mandated, by the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1).  That Act provides: "An officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation . . . ."  *Id.*  HHS argues that by accepting the Tribe's proposal it would have violated this provision by obligating HHS to pay the Tribe an amount of CSCs in excess of appropriations available for fiscal year 2005.

HHS ignores the fact that the Tribe's proposal, as amended, sought CSCs beginning in fiscal year 2006, not 2005.  This oversight is fatal to HHS's argument.  Because the Tribe's proposal did not request *any* amounts for CSCs in

---

[7] Even if the Tribe *had* proposed an amount of CSC "in excess of the applicable funding level for the contract," 25 U.S.C. § 450f(a)(2)(D), that fact alone would not have entitled HHS to decline the Tribe's *entire* contract.  The ISDA requires HHS to approve any severable portion of a contract.  *Id.* § 450f(a)(4)(B).  Thus, absent a separate ground for declination, HHS still would have been required, for example, to approve the Tribe's request for the secretarial amount, which HHS never contended was "unavailable" for transfer to the Tribe.

-19-

fiscal year 2005, HHS cannot plausibly contend that accepting the Tribe's proposal would have obligated it to make payments of CSCs in *excess* of appropriations available for that fiscal year. The fact that the Tribe initially sought CSCs to begin operating the Clinic during the 2005 fiscal year (on May 1, 2005) is immaterial. By the time HHS issued its declination letter on August 15, 2005, the Tribe's originally-proposed start date had lapsed and been superseded by the October 1, 2005 start date listed in the amended proposal.

The Anti-Deficiency Act would not have barred HHS from accepting the Tribe's amended proposal for CSCs beginning in fiscal year 2006. The Act provides: "An officer or employee of the United States Government may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made *unless authorized by law*." 31 U.S.C. § 1341(a)(1) (emphasis added). The Tribe submitted its proposal before appropriations had been made for fiscal year 2006. But as we have recently explained, there is no question that "the ISDA permits [HHS] to enter into self-determination contracts prior to Congress appropriating funds." *Ramah Navajo Chapter*, 644 F.3d at 1076. This is why it is especially important that these contracts are required to specify that payment of CSC is "[s]ubject to the availability of appropriations," 25 U.S.C. § 450*l*(c) (model contract § 1(b)(4)). *See Cherokee Nation*, 543 U.S. at 643 (noting that "subject to availability of appropriations" language "normally makes clear that an agency and a contracting

-20-

party can negotiate a contract prior to the beginning of a fiscal year"); *see also*

*Ramah Navajo Chapter*, 644 F.3d at 1076 ("The 'subject to the availability of

appropriations' language would be rendered meaningless unless the contract was

signed prior to congressional appropriations."). Because the ISDA authorizes the

Secretary to enter into self-determination contracts before an appropriation is

made, HHS would not have violated the Anti-Deficiency Act if it had accepted,

rather than rejected, the Tribe's proposal.

3.

HHS's appeal to the Appropriations Clause is equally unavailing. The

Appropriations Clause states: "No Money shall be drawn from the Treasury, but in

Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7.

HHS argues that, because it had no remaining CSC appropriations for fiscal year

2005, accepting the Tribe's proposal would have violated the Appropriations

Clause by committing HHS "to pay money that had not been appropriated by

Congress." Aple. Br. at 39. But this is not so. As explained above, accepting the

Tribe's proposal would have committed HHS to pay CSC in fiscal year 2006, not

fiscal year 2005. And even then, payment under the contract would be "subject to

the availability of appropriations." 25 U.S.C. § 450*l*(c) (model agreement

§ 1(b)(4)). The Appropriations Clause did not prohibit HHS from entering into a

contract to pay the Tribe's CSC for a later fiscal year when its payment of CSC

under the contract would be "subject to the availability of appropriations." *Id.*

B.

Having held that HHS was required to contract with the Tribe, we turn to the Tribe's contentions that the district court erred in: 1) directing the Tribe to accept HHS's proposed contract language waiving immediate payment of CSCs, and 2) determining that the contract's start date would be October 1, 2009. We consider these contentions in turn.

1.

We begin with the disputed CSC language. After the district court correctly held that it was impermissible for HHS to condition approval of the Tribe's contract on the "availability of appropriations," the Tribe sought a contract providing the full statutory amount of CSCs (which the parties ultimately agreed was approximately $1.2 million). The Tribe agreed to add the statutorily-mandated caveat that payment of funds under the contract would be "subject to the availability of appropriations," but it refused HHS's continued pleas to add language conceding that "available appropriations" were, in fact, insufficient to pay any of the Tribe's CSCs upon execution of the contract.

In response, HHS sought an order from the district court requiring the Tribe to "waive immediate payment of CSC" on the ground that HHS lacked funds to pay them. *Southern Ute II*, at 8. The district court obliged and directed the Tribe to include HHS's proposed language in the annual funding agreement (of the yet-to-be executed contract) indicating:

-22-

> [HHS] currently owe[s] the Tribe $0 in CSC . . . ; that the CSC
> amount reflecting [the Tribe's] required CSC will be calculated; but
> in view of the congressional earmark for CSC, the amount will be
> placed on the shortfall list for payment if and when funding becomes
> available.

*Id*. at 6. The court determined these terms were not prohibited by the ISDA. It also opined that the Tribe "should have no objection to the inclusion of [these] terms in the annual funding agreement which reflect the practical ramifications of the current statutory cap on available appropriations." *Id.* at 8-9. It also cautioned that the omission of such language would "open[] the door to unwinnable – and perhaps frivolous – breach of contract claims," *id.* at 9, by authorizing the Tribe to press its claim for immediate payment of CSCs when HHS clearly lacked any funds to pay them.

The Tribe contends that the district court's ruling required it to accept CSC terms that deviate from the model agreement and conflict with the ISDA's funding provisions. We conclude that the required CSC language is without basis and also violates the ISDA.

The premise of the district court's ruling – that "available appropriations" were insufficient to pay CSCs upon execution of the contract – is not supported by the record. The only evidence HHS presented to the district court was an affidavit discussing the congressional cap on CSC appropriations for fiscal year 2005. The cap on fiscal year 2005 appropriations, however, had nothing to do with HHS's ability to pay CSCs upon execution of the contract at issue here – a contact which

would not be executed until *after* the court issued its ruling in October 2007 and which did not seek funds for fiscal year 2005. There thus was no basis upon which to conclude that HHS's appropriations would be unavailable to pay the Tribe any amount for CSCs upon execution of the contract.[8]

Even assuming *arguendo*, that HHS lacked funds to pay any CSCs upon execution of the contract, it was improper to require the Tribe to include HHS's requested CSC language. That language identifies the "current" level of CSC funding as "$0," which is contrary to the ISDA's requirement that each contract include the full amount of CSCs. *See* 25 U.S.C. § 450j-1(a)(2); *accord id.* § 450*l*(c) (model agreement § 1(b)(4)). The ISDA defines that amount as the "amount for the reasonable costs for activities which must be carried on by" the Tribe. *Id.* § 450j-1(a)(2). Under the plain text of the statute, it is not, and can never be, "$0," which is what HHS's requested language required.

---

[8] This case illustrates a further practical problem with attempting to determine prospectively whether appropriations will be available to pay CSCs at the beginning of a contract that has not been executed. At least in this case, it would have been impossible for the district court to predict *ex ante* when the contract would, in fact, be executed. As noted above, the Tribe appealed the district court's October 2007 ruling to this court, and we dismissed the appeal for lack of jurisdiction. *Southern Ute III*, 564 F.3d 1198. The district court did not issue its final order, requiring the inclusion the CSC language, until September 2009. *See Southern Ute IV*, Civil No. 05-988. As a result, the ultimate start date for the contract – October 1, 2009 – was a date which neither the district court, nor the parties, could have predicted. The effect of the court's ruling, therefore, was to require the Tribe to add language to the contract conceding that appropriations were unavailable to pay CSCs starting in fiscal year 2010.

The district court determined the CSC language did not violate the ISDA. Rather, the court held, the language described the "time and method of payment," as required by the ISDA's model agreement. *See id.* § 450*l*(c) (model agreement § 1(f)(2)(A)) (stating that the annual funding agreement "shall contain," *inter alia*, "terms that identify . . . the funds to be provided, and the time and method of payment"). Namely, the Tribe would receive $0 "now," would be placed on the "shortfall list," and paid later, "if and when" funds became available.

We respectfully disagree with the district court's interpretation of the statute. The meaning of "time and method of payment" is plain when read in light of the "payment" provision of the model agreement, which is titled "[q]uarterly, semiannual, lump-sum, and other methods of payment." *Id.* § 450*l*(c) (model agreement § 1(b)(6)(B)). The provision does not include or contemplate, much less require, that "possible payment from the shortfall list" should be included in a contract as an additional, unstated "method[] of payment." *See id.* This provision of the model agreement does not justify the CSC language requiring the Tribe to waive full funding of its CSCs.

For these reasons, we hold that the Tribe is entitled to a contract specifying the full statutory amount of CSCs, not "$0", albeit with the required caveat that "the provision of funds . . . is subject to the availability of appropriations," *id.* § 450j-1(b); *accord id.* § 450*l*(c) (model agreement § 1(b)(4)). A tribe cannot be forced to enter into a self-determination contract waiving its entitlement to full

CSC funding. Any disputes about whether funds are, in fact, available to pay the Tribe's CSCs remain open and litigable. *See* 25 U.S.C. § 450m-1. Nothing in the contract's annual funding agreement should be read to affect that determination.[9]

2.

The Tribe also challenges the district court's determination that the appropriate start date of the contract is the date on which the Tribe assumed operation of the Clinic. The Tribe contends its contract was "approved by operation of law" when the district court held in its initial order that HHS lacked discretion to decline the Tribe's contract proposal, which specified an October 1, 2005 start date. Accordingly, the Tribe argues that the contract's start date should be October 1, 2005, the date designated in its amended contract proposal, not October 1, 2009, the date it began operating the Clinic. We are not persuaded.

The ISDA's model agreement makes clear that the default start date for a contract is the date on which the contract is approved and *executed by the parties*. 25 U.S.C. § 450*l*(c) (model agreement § 1(b)(2)) (emphasis added) ("The Contract shall become effective upon the approval and execution, by the [tribe] and the Secretary, unless the [tribe] and the Secretary agree on [another] effective

---

[9] Because we conclude that the district court's ruling was based on an erroneous reading of the ISDA, we do not decide whether, as the Tribe contends, the district court exceeded its equitable authority under the ISDA by "entering relief against the Tribe." Aplt. Br. at 32.

date . . . .").  The Tribe does not offer any persuasive authority or rationale to suggest a different rule should apply with respect to the contract at issue here.

The Tribe cites one decision in which a court expressly deemed a contract and its successor funding agreement to be "approved by operation of law," as a result of the Secretary's "failure to comply with the declination statutes and regulations."  *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1062-68  (D.S.D. 2007).  In that case, the Bureau of Indian Affairs (BIA) refused to continue funding an already-executed mature contract.  In doing so, it failed to take timely action on the tribe's request for funding as required by the ISDA's declination guidelines.  *Id.* at 1068; *see also* 25 U.S.C. § 450f (directing the Secretary to approve or decline proposals within ninety days of submission); *accord* 25 C.F.R. § 900.16 (same).  The district court's ruling that the contract and successor funding agreement were "approved by operation of the law," *Cheyenne*, 496 F. Supp. 2d at 1068, simply reflected the tribe's right to continued funding for costs incurred under an already existing contract.

The Tribe also relies on *Crownpoint Inst. of Tech. v. Norton*, Findings of Fact and Conclusions of Law, Civ. No. 04-531 JP/DJS (D.N.M. Sept. 19, 2005).  There, the district court similarly held that the BIA had wrongfully declined a series of self-determination contract proposals.  The court deemed the contracts to be approved a certain number of days after the tribe submitted those proposals to the BIA.  In that case, however, the Tribe had been running the program for years

-27-

before the district court ordered the BIA to enter into the wrongfully declined contracts. The "deemed" start dates, therefore, were necessary to assure that the tribe would be reimbursed for costs it incurred while operating the program before the contracts were formally executed.

*Cheyenne* and *Crownpoint* suggest that a "deemed" start date may be appropriate when it is necessary to ensure that a tribe is reimbursed for costs and expenses of running the program before the court-mandated execution of a contract. But that rationale is not applicable here, where the Tribe did not begin operating the Clinic until October 1, 2009, and thus did not incur any such costs or expenses until four years after the October 1, 2005 start date listed in its proposal. Unlike in *Cheyenne* and *Crownpoint*, a retroactive start date is not necessary to ensure the Tribe is reimbursed for program-related costs incurred before the parties executed their contract.

Nor has the Tribe persuaded us it was prejudiced by the October 1, 2009 start date. The Tribe suggests the later start date denied it the opportunity to recover damages for HHS's failure to execute a contract beginning October 1, 2005. The statute gives federal courts jurisdiction "over any civil action or claim against the Secretary for money damages *arising under contracts*" authorized by the statute. 25 U.S.C. § 450m-1(a) (emphasis added). The Tribe asserts it would be entitled, for example, to interest it could have earned on "amounts it would have been paid to operate the Clinic." Aplt. Br. at 26. The district court

dismissed any such claim as speculative. We need not decide whether such lost profits could ever be recovered under the statute because the Tribe has offered no authority to convince us the district court erred in concluding such damages would be wholly speculative.

Absent any authority or rationale for doing otherwise, we affirm the district court's determination that the start date of the contract is October 1, 2009, not October 1, 2005.

III.

For the reasons stated above, we **AFFIRM** the district court's determination that HHS was required to enter a contract with the Tribe. As to the contract's specifics, we **REVERSE** the court's ruling requiring the inclusion of HHS's requested CSC terms and **AFFIRM** its determination that the start date of the contract is October 1, 2009, the date on which the Tribe began operating the Clinic pursuant to the executed contract.